**Louisa B. Gunther FARCASANU, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 23080.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 16, 1970.

Decided Aug. 20, 1970.

Petition for Rehearing Denied. Oct. 13, 1970.

Mr. Clifford J. Hynning, Washington, D. C., with whom Mr. Bartholomew B. Coyne, was on the brief, for appellant.

Mr. Leonard J. Henzke, Jr., Atty., Department of Justice, with whom Asst. Atty. Gen. Johnnie M. Walters, Messrs. Fred B. Ugast, Lee A. Jackson, and William A. Friedlander, Attys., Department of Justice, were on the brief, for appellee.

Before TAMM, ROBINSON, and ROBB, Circuit Judges.

**PER CURIAM:**

In this appeal we are urged to reverse a decision of the Tax Court holding that appellant was properly denied a deduction which she claimed on her income tax return for calendar year 1959 under section 165(c) (3) of the Internal Revenue Code of 1954[1] for losses allegedly incurred as a result of theft of personal property. For reasons to be stated more fully below, we conclude that the decision of the Tax Court is correct and must be affirmed.

Because appellant's attempts to recover some compensation for her property extend over several decades and arise out of unusual circumstances, a somewhat lengthy recital of the underlying facts is necessary to an intelligible exposition of the legal issues. According to the Tax Court's findings, appellant was the wife of Franklin M. Gunther in 1937 when Gunther was named United States Minister Plenipotentiary to Rumania. The prevailing custom in those days apparently dictated that the Minister furnish his quarters at his own expense in a manner commensurate with the dignity of the office, and so the Gunthers, who were serious art collectors, took with them to Bucharest an extensive assortment of rare and valuable furnishings, art works, and antiques.[2]

In 1941 Franklin Gunther was stricken with leukemia; he died in Bucharest on December 22 of that year, just eleven days after the Rumanian government had declared war on the United States. Shortly thereafter Mrs. Gunther was forced to flee the country in great haste, leaving behind her husband's remains and all of the personal property she could not carry with her. Most of the Gunthers' property was packed in crates and stored in an air raid shelter in the basement of the American Chancellery building; other items were left with friends in Rumania. The property remained there until Rumania signed an armistice with the Allied powers on September 12, 1944. In the meantime, Franklin Gunther's will, which was probated in this country, bequeathed all of his interest in the personalty to appellant.

By March of 1945, the occupying Soviet troops in collaboration with Rumanian Communists, had established a Communist-dominated government in Rumania. There followed a protracted period of unrest and internal disorder during which, the Tax Court found, the government "issued numerous decrees or proclamations, dealing with such matters as confiscation of private property"; in addition, "widespread taking of property, arrests, and other intimidating and repressive acts on the part of the Communists * * * affecting 'unfriendly' Rumanians" took place. (Tr.Doc. 62, at 5-6.) It was during this period, in November of 1945, that appellant returned to Bucharest. Inspection of the stored property revealed that it was still intact; however, the need for extra space in the Chancellery building forced appellant to remove the goods that were stored there and place them in the homes of friends during 1946. At this time appellant wished to leave Rumania, but she "was persuaded by the head of the American Mission to stay on because of * * * her connections with the royal family which made it possible for her to obtain information from the palace which was of value to the American Mission." (Tr.Doc. 62, at 8.) Finally, in the early part of 1947 appellant was informed that her mother was seriously ill, and she returned to this country,

---

1. The relevant portions of section 165 of the Internal Revenue Code of 1954 are, for present purposes, identical to the corresponding provisions of its predecessor, section 23 of the Internal Revenue Code of 1939; thus, several of the decisions cited in this opinion were decided under the 1939 Code.

2. For example, the inventory of lost property contained in the record (J.A. 76-78) lists a number of Chinese paintings from the Ming and Sung periods, several rare oriental carpets, nearly thirty Chippendale chairs, and miscellaneous works by Donatello, Ucello, and Poussin.

bringing with her only such property as could be taken on a commercial airline flight.

Thereafter Mrs. Gunther engaged in a number of written and oral communications with officials of the government of the United States relating to her property, but no affirmative steps were taken to have the goods shipped out of Rumania, largely because it was feared that direct attempts to obtain the property would bring its custodians into disfavor with the Rumanian government. In March of 1949 the State Department issued a press release advising American citizens whose property had been affected by the Rumanian nationalization laws not to apply for compensation for seized property in accordance with the procedures established by the Rumanian government; instead, steps were taken to compensate such individuals from blocked Rumanian funds held by the United States since the outbreak of the war. Finally, in 1956 appellant received a communication from the State Department, advising her to present a claim for her lost property to the Foreign Claims Settlement Commission. She eventually submitted a claim totaling $295,716.50 for the property in question. This claim resulted in an award of $103,445.00, issued in 1959; in the same year, appellant received a payment on this award of $33,782.40, of which approximately one-third was consumed by attorneys' fees and expenses. At that time it did not appear likely that appellant would receive any other substantial compensation from the award, although she did in fact receive a small additional payment in 1960.

In her tax return for 1959, appellant claimed a deduction for the difference between the amount of her original claim with the Settlement Commission and the figure finally awarded by the Commission, or an amount of $192,271.50. The Internal Revenue Service entered a deficiency notice, concluding that this amount was not deductible under any section of the Internal Revenue Code. The proceedings presently under review resulted.

■ Appellant's principal assertion is that the deduction described above is allowable under section 165 of the Internal Revenue Code of 1954, which in relevant part provides:

(a) *General Rule.* There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \*

(c) *Limitations on Losses of Individuals.* In the case of an individual, the deduction under subsection (a) shall be limited to—

\* \* \* \* \* \*

(3) losses of property not connected with a trade or business, if such losses arise \* \* \* from theft.

In passing upon this contention, the Tax Court found:

[T]he testimony has not been so clear that we can feel certain as to who did what, and when, to petitioner's property in Rumania after 1945. However, on the whole record, we have concluded that all of the property left in Rumania by petitioner was seized or confiscated by agents of the Communist-controlled government of Rumania \* \* \* and that *such seizures or confiscations were under color of decrees issued by that government. Of one thing we are certain, and that is that petitioner has not proved the contrary.*

(Tr. Doc. 62, at 18; emphasis added.) Our review of these findings is strictly limited; the general rule is well established "that the findings of the Tax Court are presumptively correct, and that the burden rests with the [appellant] to show that such findings are 'clearly erroneous' before this court may set them aside." Kemper v. Commissioner of Internal Revenue, 269 F.2d 184, 185–186 (8th Cir.1959); *see also* Commissioner of Internal Revenue v.

Duberstein, 363 U.S. 278, 289–291, 80 S. Ct. 1190, 4 L.Ed.2d 1218 (1960)..

While not attacking these findings directly, however, appellant asserts that the confiscation of her property was violative of Rumanian and international law, and therefore fit within the definition of theft for purposes of section 165. It is true that the word "theft" as used in section 165 has been defined broadly to encompass illegal takings other than those constituting the crime of larceny; *see, e.g.*, Edwards v. Bromberg, 232 F.2d 107 (5th Cir.1956). It is also true that the law of the situs of the taking has generally been the governing standard for the determination of illegality; *see, e.g.*, Bonney v. Commissioner of Internal Revenue, 247 F.2d 237 (2d Cir.), cert. denied, 355 U.S. 906, 78 S.Ct. 333, 2 L. Ed.2d 261 (1957). However, the courts in construing this provision have consistently required that the taking be accompanied by criminal intent in order to render the taxpayer's loss deductible under section 165. *See* Johnson v. United States, 291 F.2d 908, 909 (8th Cir. 1961); Edwards v. Bromberg, *supra*, 232 F.2d at 110. Thus, a sharp distinction has emerged between takings of private property which are made under color of governmental authority, and takings which transpire in clear violation of the commands of the sovereign. Illustrations of this principle are Weinmann v. United States, 278 F.2d 474, 475–476 (2d Cir.1960) ("It is common ground that nationalization does not constitute a casualty or theft loss" under the predecessor of section 165.), and Powers v. Commissioner of Internal Revenue, 36 T.C. 1191, 1192 (1961) ("It seems clear that the confiscation of petitioner's automobile by officials in East Germany acting under color of legal authority, arbitrary and despotic as it may have been, could not have been a 'theft' for tax deduction purposes."). That this distinction is consistent with the congressional understanding of the meaning of the term "theft" in section 165 is evidenced by the 1964 amendments to this provision. (78 Stat. 19, 237 (1964).) At that time Congress felt it necessary to add a special subsection allowing deductions for losses resulting from the seizure of property by the Castro government in Cuba because the existing law "provided that in the case of an individual, no loss deduction may be taken for expropriation or similiar taking of property by a foreign government, if the property was not used in a trade or business or in the production of income." 110 Cong.Rec. 15,130 (1964) (remarks of Senator Williams, sponsor of the amendment); *see also id.* at 15,472 (remarks of Representative Mills).

■■ The existence *vel non* of criminal intent in the circumstances of a particular taking is clearly a question of fact, and one which usually is peculiarly within the competence of the trial tribunal. *Cf.* Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); United States v. Terry, 137 U.S.App.D. C. 267, 422 F.2d 704 (1970). Under established principles appellant bore the burden of proof on this material issue,[3] and, as noted above, the Tax Court concluded that she had not discharged that burden. "[T]he task of applying the statutory criteria to the multitude of particular situations that inevitably arise is to be left to the District Court and the tax court, as the case may be, and their conclusions are reviewable only for clear error." United States v. McNair Realty Co., 298 F.2d 35 (9th Cir.

---

**3.** *See, e. g.*, Allen v. Commissioner of Internal Revenue 16 T.C. 163, 166 (1951), which also involved a deduction claimed for theft losses:

> Petitioner has the burden of proof. This includes presentation of proof which, absent positive proof, reasonably leads us to conclude that the article was stolen. If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail. If the evidence is in equipoise preponderating neither to the one nor the other conclusion, petitioner has not carried her burden.

1961); *cf.* Bord v. District of Columbia, 120 U.S.App.D.C. 175, 178, 344 F.2d 560, 563 (1965). Since the Tax Court's decision on this question is reasonable, supported by substantial evidence, and in accord with applicable principles of law, it must be affirmed.

In this court appellant also raises the alternative contention that her property losses were deductible because they were "incurred in a trade or business" under section 165(c) (1) of the Internal Revenue Code of 1954 and its statutory predecessor. This argument is premised on the theory that, because the Minister to Rumania was expected to provide the appointments for his quarters, these items were necessary for the conduct of his trade. However, this contention was not properly advanced before the Tax Court—indeed, it was specifically disclaimed by the appellant in those proceedings (Petitioner's Reply Brief in the Tax Court at 4)—and thus the record is inadequate to support appellant's argument. Accordingly, we find no basis for reversing the Tax Court's decision on this ground.

Affirmed.