HOWARD W. MONGOLD and DOROTHY L. B. MONGOLD, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mongold v. Commissioner
Docket No. 16062-79.
United States Tax Court
T.C. Memo 1981-715; 1981 Tax Ct. Memo LEXIS 34; 43 T.C.M. (CCH) 117; T.C.M. (RIA) 81715; December 17, 1981
Charles C. Morrey, for the petitioners. William H. Quealy, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined a deficiency in petitioners' 1975 Federal income taxes of $ 20,742. We must determine whether petitioners are entitled to a theft loss deduction pursuant to section 165. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Howard W. Mongold (Mr. Mongold) and Dorothy L. B. Mongold (Mrs. Mongold), timely filed a joint Federal income *35 tax return for the year in dispute with the Internal Revenue Service at Fresno, California. At the time they filed their petition in this case, petitioners resided in Newport Beach, California. By letter dated December 17, 1968, petitioners were invited to visit San Antonio Shores, an area then under development located near the town of Rosarito Beach in the State of Baja California (Baja), Mexico. On January 12, 1969, petitioners entered into an agreement with International Resort Properties of Mexico, S.A.C.V. (Resort Properties), whereby petitioners leased Lot Z [2] (also referred to as Lot 144) for a term of 99 years. The lease gave petitioners an option to purchase the property, if they could fulfill the Mexican legal requirements for holding title to property, or to put title to the property in trust with petitioners as beneficiaries. Resort Properties, a corporation formed under the laws of Baja, was represented in this transaction by Lic. Manuel Corzo Blanco (Lic. Blanco). Petitioners paid a total consideration of $ 9,500 to Lic. Blanco and Resort Properties for Lot 144. *36 During 1969, petitioners constructed a three-bedroom personal vacation house costing $ 22,756.36 on Lot 144. Petitioners occupied this house periodically (usually every weekend) from its completion in November 1969 until February 1975. On April 5, 1970, petitioners entered into an agreement with Lic. Blanco and the San Antonio, Club Hipico Y De Golf, S.A. De C.V. (also known as the San Antonio Golf and Riding Club, S.A. De C.V.) (Club), for the purchase of a membership certificate in the Club. In addition to the use of the Club's properties and recreational facilities, petitioners' membership entitled them to the exclusive use of a parcel of real property, Lot 145, for the duration of the Club's existence (until the year 2069). Petitioners paid $ 9,000 for this Club membership. Lot 145, which adjoins Lot 144, was left vacant by petitioners. Both lots 144 and 145 are located in the zone of property in Mexico which is within 50 kilometers of the Pacific coast and within 100 kilometers of the border between Mexico and the United States (the forbidden zone), and lie partially within the Federal Maritime Zone. [3]
*37 In 1971, petitioners received a letter notifying them that Lic. Blanco and Donald Eastvold (Mr. Eastvold) were no longer associated with San Antonio Shores and that Arturo Figueroa and Mr. Guitterez would be responsible for operating San Antonio Shores. The following year, 1972, petitioners were notified that the State of Baja would take over the running of San Antonio Shores. Petitioners were aware, prior to leasing Lot 144 and purchasing the Club membership, that, under Mexican law, non-Mexicans may not acquire direct ownership of lands in the forbidden zone. Although petitioners had continuing access to their house in Baja, they received conflicting information as to the validity of their ownership interests in Lots 144 and 145. After acquiring Lot 144, petitioners received a letter from a Beverly Hills law firm stating that, although the 99-year leases were valid leases, San Antonio Shores would henceforth issue Club membership agreements. In 1970 or 1971, petitioners received: (1) a report from Lic. Blanco that the Attorney General of Baja had "plac[ed] the Government's legal stamp of approval on San Antonio Shores, and more particularly, on the legality and enforceability *38 of our Membership Agreement"; (2) a translation of a letter from Lic. Felipe Tena Ramirez, a former professor of law and a retired justice of the Supreme Court of Mexico, stating that in his opinion the "Contract for Purchase of Personal Membership Rights" did not violate Mexican law. In 1971, however, Mr. Mongold read newspaper articles stating that at least two Mexican courts had awarded damages to American investors who had sued San Antonio Shores. Petitioners received a letter (the Cooper letter), dated October 14, 1974, from Mr. James Murad, of Cooper, White & Cooper, counsel for Baja, advising petitioner and all San Antonio Shores' investors of the current status of and proposed plan of reorganization for San Antonio Shores. The Cooper letter stated that: (1) the forms which the transfers of interests in San Antonio Shores took were attempts to circumvent the constitutional prohibition against non-Mexicans holding land in the forbidden zone and investors' interests were thus invalid under Mexican law; (2) the money paid by investors in San Antonio Shores was misapplied, the development work was poorly executed and was never completed; (3) in an attempt to ameliorate some *39 of the damage caused by these attempts to transfer real estate interests in the forbidden zone, Mexico had passed a law permitting the establishment of trusts (fideicomisos) whereby a non-Mexican could obtain a 30-year beneficial interest in the land in the prohibited zone; (4) Baja had acquired title to the San Antonio Shores land and proposed a tentative plan of reorganization whereby investors might be able to receive some interest in San Antonio shores; (5) in order partially to reimburse Baja for costs incurred in operating San Antonio Shores and to provide funds for future development of the property, an assessment of approximately $ 4,500 per lot was necessary; (6) at least 800 responses favoring the proposed reorganization were necessary before such plan would be implemented; and (7) if sufficient affirmative responses were not forthcoming, Baja would utilize the land as it saw fit and investors would have no interest in the property and would not be reimbursed for their original investment. Response to Baja's offer was insufficient to prompt the State to implement its plan of reorganization as outlined in the Cooper letter. Baja, however, made other provisions so that *40 petitioners and other investors could acquire, via fideicomisos, beneficial interests in San Antonio Shores. [4]
On February 27, 1975, petitioners were requested to meet at San Antonio Shores with Senor Francisco Javier Rivas Martinez (Martinez), a representative of the Secretary for Economic Development to the Office of the Governor of Baja. When petitioners met with Martinez on February 28, 1975, they were informed that assessments of $ 11,702.77 and $ 12,717.86 (as compared with Baja's previous estimate of $ 4,500 per lot) were being levied upon their interests in Lots 144 and 145, respectively, for the purpose of completing the facilities at San Antonio Shores. The petitioners refused to pay the assessments and were advised that they had until March 30, 1975, to remove their belongings from *41 their vacation home on Lot 144, after which time petitioners would be refused entry to San Antonio Shores. Sometime in March, Mr. Mongold rented a truck and went down to remove the furniture from their house on Lot 144. Mr. Mongold removed as much of the furnishings as the truck would hold. Fixtures and furnishings valued by petitioner and respondent at $ 1,562 were not removed from petitioners' vacation home. Petitioners had no further correspondence with Baja or with Martinez after March 22, 1975. On their 1975 joint Federal income tax return, petitioners claimed a deduction of $ 42,818 for a casualty loss resulting from the loss of their vacation home, fixtures and furnishings remaining therein, and Lots 144 and 145. OPINION Respondent has denied petitioners' deduction for the loss of the Baja property and, accordingly, has determined a deficiency of $ 20,742 in their 1975 Federal income taxes. Respondent's argument has three prongs: (1) petitioners suffered no loss attributable to theft or other casualty; (2) if there was a theft loss, it was properly deductible in a year prior to 1975; (3) if there was a theft loss in 1975, the petitioner's deduction should be limited *42 to $ 18,500, the cost of Lots 144 and 145. The parties have stipulated that petitioners held the Baja property for personal use, rather than for use in a trade or business or for the production of income. Losses attributable to the diminution in value of property held by individuals for personal use are deductible only if such losses "arise from fire, storm, shipwreck, or other casualty, or from theft." Section 165(d)(3). Both respondent and petitioners agree that, although on petitioners' return the loss was labeled as a casualty loss, if any loss is deductible, it is a theft loss. It is a well established principle that the taking of property by a government under color of governmental authority does not constitute a theft. See, e.g., Farcasanu v. Commissioner, 436 F.2d 146, 149 (D.C. Cir. 1970), affg. 50 T.C. 881 (1968). Therefore, the taking of petitioners' property by the State of Baja does not give rise to a deductible theft loss, and petitioners in their *43 reply brief conceded this point. As we understand petitioners' argument, however, it is that Mr. Eastvold and Lic. Blanco, acting on behalf of Resort Properties, made fraudulent misrepresentations to petitioners at the time petitioners purchased their interests in Lots 144 and 145, that these misrepresentations resulted in petitioners' loss, and that these misrepresentations constitute theft within the meaning of section 165. Although, according to petitioners' argument, any such misrepresentations occurred in 1969 and 1970, petitioners contend that it was not until 1975 that they established with reasonable certainty whether or not they would recover any of their loss and that 1975 is thus the correct year for the theft deduction. Unquestionably if a deductible loss from theft occurred, the proper time for petitioners' deduction would be the year in which any reasonable prospect of recovery ceased to exist. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975). However, there is a threshold issue which must first *44 be resolved, namely, whether petitioners have established that their loss was a result of theft. For purposes of section 165, the word "theft" is broadly defined to include larceny, embezzlement, robbery, and "any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956); sec. 1.165-8(d), Income Tax Regs. See also, Vietzke v. Commissioner, 37 T.C. 504, 510-511 (1961). The question of whether or not the activity resulting in petitioners' loss is a theft is determined by the application to the facts of the criminal laws of the place where the loss was sustained. Paine v. Commissioner, 63 T.C. 736 (1975), affd. without opinion 523 F.2d 1053 (5th Cir. 1975). Petitioners bear the burden of proof. Rule 142(a). To sustain their burden, petitioners need *45 not introduce evidence of a criminal conviction. Paine v. Commissioner, supra at 740; Monteleone v. Commissioner, 34 T.C. 688, 694 (1960). As petitioners concede, however, they must establish that any misrepresentations amounted to criminal fraud -- that such representations were made with the criminal intent to deprive petitioners of their property. See Paine v. Commissioner, supra at 741-742. Petitioners have presented the following evidence which, they contend, establishes that they were criminally defrauded by Resort Properties, Mr. Eastvold, and/or Lic. Blanco: (1) the Cooper letter wherein Baja described the San Antonio Shores problem as essentially a situation where individuals who did not own the land attempted to transfer interests to persons who under Mexican law were ineligible to acquire such interest and (2) Mr. Mongold's testimony, based in part on a conversation with the Los Angeles District Attorney, that Mr. Eastwold and Lic. Blanco were "sued" for "fraud" by the State of California. Based on a careful review of the evidence presented, we hold that petitioners have failed to establish that the loss *46 of their Baja property was due to criminal fraud. The Cooper letter stated that "San Antonio Shores is an instance in which persons who did not own land attempted to transfer real estate interests * * * to others who could not acquire them and then misapplied the sales proceeds." Petitioners adopt this characterization of the situation and argue that Lic. Blanco and Mr. Eastvold, acting on behalf of Resort Properties, represented to petitioners that Resort Properties was legally able to transfer interests in Lots 144 and 145 to petitioners and that the lease and Club membership were effective vehicles for transferring use of the land to the Mongolds.Baja officials later determined that petitioners, as foreigners, were not entitled under Mexican law to hold direct ownership of any real property in the forbidden zone, that the 99-year lease and the club membership amounted to direct ownership and thus were invalid. Baja later seized petitioners' property. Baja's determination of the invalidity of the leases and the seizure of the Mongolds' property, petitioners contend, proves the fraudulency of the leases. Although petitioners are correct that *47 fraudulent misrepresentations may give rise to a theft loss deduction, see e.g., Paine v. Commissioner, supra at 740, and assuming arguendo that the Cooper letter correctly describes the San Antonio Shores situation, petitioners have failed to establish that their loss was the result of fraudulent misrepresentations. Petitioners have not presented sufficient evidence to convince us that they were induced to invest in San Antonio Shores by any false statements made by Mr. Eastvold or Lic. Blanco, nor have petitioners shown that false statements, if any, were made by Mr. Eastvold or Lic. Blanco with the intent to unlawfully deprive petitioners of their property. We emphasize, in response to petitioners' strong arguments to the contrary, that Baja's characterization of the San Antonio problem does not establish that the petitioners were defrauded. The mere fact that the lease and membership agreement were unlawful does not establish fraud on behalf of Resort Properties. See Paine v. Commissioner, supra at 740. In fact, it appears that the validity of the 99-year lease and the membership agreement *48 were unanswered questions in 1969 and 1970. [5] Mr. Mongold testified that the Attorney General of Baja, a Beverly Hills law firm, and a former Supreme Court Justice of Mexico opined that the membership agreement was valid under Mexican law, and the Beverly Hills law firm opined that the 99-year-lease was valid. The evidence establishes not that petitioners' loss was due to fraud, but rather that it was due to the adverse determination of a previously unsettled issue of law. Mr. Mongold testified that Mr. Eastvold and Lic. Blanco were sued *49 by the State of California; that Mr. Eastvold was convicted of fraud and fined; and that Lic. Blanco, a Mexican citizen, failed to appear at the trial but was nevertheless convicted. While we do not doubt that Mr. Mongold is relating what he believes the facts to be, we are unable to find that his testimony establishes that Lic. Blanco and Mr. Eastvold criminally defrauded petitioners. Based on Mr. Mongold's testimony, it is unclear whether the lawsuit was for criminal or civil fraud. [6] Even if Mr. Eastvold and Lic. Blanco were convicted of criminal fraud, there is no evidence that the facts on which the convictions were based relate to agreements the same as or similar to those signed between petitioners and Resort Properties. *50 For similar reasons, the clippings from an unidentified newspaper, reporting that several American investors had recovered damages against San Antonio Shores, do not establish fraud on behalf of Resort Properties in their dealings with the Mongolds. The suits were civil rather than criminal, there is evidence that the decisions would be appealed, and consequently there was no indication as to their ultimate outcome, and, again, there is no evidence that the suits resulted from factual circumstances similar to those which occurred between the Mongolds and Resort Properties. Having decided that petitioners are not entitled to a deduction, because they have failed to establish that their loss was the result of theft within the meaning of section 165, we need not address the issues involving the proper year of deduction or the measure of the loss. [7]
*51 Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. In two instances, the parties' stipulations refer to Lot 2. It appears that these are merely typographical errors and that the references are to Lot Z.↩
3. The parties have stipulated that Lots 144 and 145 are within↩ the Federal Maritime Zone. Under Mexican Federal Law, the Federal Maritime Zone is that area extending inshore for 20 walkable meters from mean high tide. The Federal Maritime Zone belongs exclusively to the Mexican nation. Lot 144 extends inland 360 meters from the Pacific Ocean and it appears that Lot 145 extends inland from the ocean a similar distance. It appears, therefore, that Lots 144 and 145 are partially, but not completely, within the Federal Maritime Zone, but any discrepancy between such a conclusion and the stipulation of facts does not affect the disposition of this case.
4. The parties have stipulated that via the fideicomisos the petitioners could obtain title↩ to their lots. This appears to be a misstatement. Pursuant to Mexico's 1971 Law for the Promotion of Mexican Investment and Regulation of Foreign Investment, title to land in fideicomisos is held by credit institutions; non-Mexican individuals obtain 30-year beneficial interests only.
5. Article 49, of the Mexican Law of Nationality and Naturalization, states that "all leases of real estate for more than ten years shall be considered as alienations of property." The Mongolds' lease with San Antonio Shores stated that, pursuant to the Mexican Civil Code, the parties would enter into "such leases or renewal of such leases so that the term thereof shall be 99 years." Regardless of the effect of the renewal aspect of the Mongolds' lease, the petitioners have failed to establish that Resort Properties or its agents made fraudulent misrepresentations inducing the Mongolds to purchase their interests in San Antonio Shores.↩
6. The only other indication of the nature of the proceeding by the State of California against Eastvold and Lic. Blanco is contained in the statement regarding the San Antonio Shores letter attached to the Cooper letter, wherein it is stated, "Although the Attorney General of the State of California was successful, in August 1970, in obtaining an injunction↩ against further sales by the Eastvold-Corzo [Lic. Blanco] group, he was unable to reach the funds actually paid out by the lot purchasers." (Emphasis added.)
7. The parties have apparently assumed that if Mr. Eastvold and Lic. Blanco had in fact made false representations to petitioner, a criminal violation of Mexican law would have occurred. No attempt was made by petitioners, even on brief, to educate the Court as to the content of Mexican law on obtaining money by false pretense or like offenses. Nor has respondent made any point of petitioners' failure so to do. While the Court can take judicial notice of foreign law (Rule 146; Fed. R. Civ. Proc. 44.1↩), it has no obligation to discover such law through independent research. It so happens that, in view of the basis upon which we have disposed of the within case, exploration of the content of Mexican law, in the suggested context, by either the Court or the parties would have been an exercise in futility.