**Wolf and Herta C. KRAHMER, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 693–81T.**

United States Claims Court.

Oct. 25, 1985.

Johannes R. Krahmer, Wilmington, Del., Atty. of record for plaintiffs. Denison H. Hatch, Jr., and Morris, Nichols, Arsht & Tunnell, of counsel.

Betty N. Ferber, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Mildred L. Seidman and Gerald B. Leedom, of counsel.

## OPINION

PHILIP R. MILLER, Judge:

In this suit for refund of 1976 and 1977 income taxes the question presented is whether plaintiff was entitled to theft loss deductions for the differences between the prices he paid for two oil paintings and their actual fair market values when he ascertained the artists were not as represented.

## I.

In about 1970, plaintiff, Wolf Krahmer,[1] who had been primarily engaged in real estate purchases and sales became interested in works of art. He learned of Eilhard Mitscherlich, an art dealer and restorer, and, over the ensuing 7 years, he purchased a number of paintings from him.

In selecting his purchases, plaintiff focused on paintings described by Mitscherlich as 19th century American paintings and European paintings of the late 15th through early 20th centuries. He picked particular paintings both because he liked them and because he believed they would be good investments.

On August 16, 1971, plaintiff bought from Mitscherlich for $5,000 a painting which bore the signature "W.M. Chase" and which was described in the invoice as "Portrait of Mrs. Chase in Spanish Dress" by William Merritt Chase, a 19th and early 20th century American painter. Mitscherlich told plaintiff that the painting was by Chase and that the woman portrayed was Mrs. Chase. In a subsequent appraisal, Mitscherlich signed an affidavit stating that he had examined the painting, that it was signed and that its fair market value was $7,500.

On January 15, 1977, the painting was evaluated by Ronald M. Pisano, an expert and author on the works of William Merritt Chase. Pisano was of the opinion that the painting was not an authentic Chase. Pisano noted that there was a remote possibility that the painting was authentic but was so overrestored as to be "unrecognizable" as the hand of Chase. He concluded it was more likely a forgery, i.e., "one of many 'Chase-like' paintings that have had Chase 'signatures' added in the 1920's or 1930's in order to bring a higher prices when sold." Defendant concedes that the painting was not by Chase and the signature was a forgery. Plaintiff sold the painting in 1980 for $300, sustaining a $4,700 loss.

On June 27, 1972, plaintiff purchased from Mitscherlich for $30,000 an unsigned painting entitled "Landscape Out of Mythology." Mitscherlich represented, however, in the invoice that it was by Nicolas Poussin (1594–1665) and, in an affidavit accompanying the bill of sale, he certified that he had examined the painting, that it was by Nicolas Poussin, and that its appraised value was $75,000. On the same date he also furnished to plaintiff a descriptive signed statement, explaining the basis for his opinion that it was the work of Poussin.

On October 25, Mitscherlich executed a formal bill of sale stating that the painting was by Nicolas Poussin and the sale price was $30,000. Plaintiff subsequently paid $1,000 to someone other than Mitscherlich to restore the painting.

After several unsuccessful attempts at resale, plaintiff requested that Sotheby Parke Bernet, Inc., of New York City, authenticate the painting. Working from photographs, in August 1976 James Fack, head of Sotheby's Old Master Department, concluded the painting was not by Nicolas Poussin. Plaintiff's efforts thereafter to donate the painting to a charitable institution were unsuccessful. Finally, it was sold at auction for $2,000 by William Doyle Galleries in New York City on January 18, 1982.

On March 27, 1980, plaintiff filed a timely claim for refund for 1976, seeking $9,811 in income taxes due to the loss of $28,000 on the Poussin. No formal notice of disallowance of this claim has yet been received. On November 12, 1980, he filed a claim for refund for 1977 of $1,866 for the loss of $4,700 on the Chase. That claim was formally disallowed by a letter dated July 1, 1981. Timely suit was instituted on November 30, 1981.

## II.

In order to circumvent the limitations on deductibility of capital losses, plaintiff seeks to establish that he was the victim of

---

1. Herta Krahmer is a named plaintiff because of the joint tax return. Plaintiff is the primary actor in the relevant transactions and all references herein to plaintiff are to him unless otherwise stated.

losses arising from theft. Deduction of such a loss is allowed by I.R.C. § 165(c) even if not incurred in a trade or business.

The Code does not define "theft." However, the pertinent regulation provides that "the term 'theft' shall be deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery." Treas.Reg. § 1.165–8(d). In addition, the term has received expansive judicial interpretation. In *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir.1956), the court stated that—

> the word 'theft' [in the 1939 Code predecessor of § 165(c)] is not like 'larceny', a technical word of Art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile.

*See also Bagur v. Commissioner*, 603 F.2d 491, 501 (5th Cir.1979); *Farcasanu v. Commissioner*, 436 F.2d 146, 149 (D.C.Cir. 1970): *Boothe v. Commissioner*, 82 T.C. 804, 815 (1984), (Hamblen, J., dissenting), *rev'd*, 768 F.2d 1140 (9th Cir.1985); and *Gerstell v. Commissioner*, 46 T.C. 161, 171–72 (1966).

■ The parties agree that plaintiff paid the purchase prices of the two paintings in the belief that the artists were as represented. They also agree that the artists were not as represented and hence the fair market values of the paintings were considerably less than plaintiff was induced to pay for them. They further agree that if the misrepresentations were knowing and intentional, plaintiff was the victim of thefts in that money was obtained from him by false pretenses. Where they part company is with respect to whether the misrepresentations were in fact knowing and intentional or merely mistaken. As in every suit for refund of taxes, the burden of proof as to all facts necessary to establish an overpayment of taxes is on plaintiff. *Dysart v. United States*, 169 Ct.Cl. 276, 340 F.2d 624 (1965).

### III.

A. Mr. Mitscherlich having died in 1979, plaintiff has attempted to prove by circumstantial evidence that he knowingly defrauded plaintiff.

■ However, in considering the proper treatment of the loss attributable to the purported "Chase" painting it is unnecessary to consider such evidence, since it is deductible in any event. Unlike the "Poussin", the "Chase" painting was signed, and that signature was a forgery. Thus, anyone who sustained a loss on purchase in the belief that the painting was by William Merritt Chase was the victim of a theft by false pretenses or swindle.

■ Section 165(c) provides for deduction for losses not connected with a trade or business if they "arise from fire, storm, shipwreck, or other casualty, or from theft." In interpreting any of these terms it is fair to consider the common factors which prompted Congress to lump them together in a single phrase. These would appear to be a loss of an unusual nature, which is not ordinarily anticipated by the taxpayer, which does not necessarily involve fault, and which visits sufficiently severe adverse consequences upon the taxpayer so as to impair his ability to pay tax upon what would otherwise be his income. It is apparent that Congress' concern was not to punish the wrongdoer but to provide tax relief to the *victim* of the loss from the listed misfortunes. The intended connection is between the taxpayer and the loss, or more specifically in this case between the taxpayer and the theft, not between the taxpayer and the thief. Thus, it should make no difference in the application of this relief statute whether the taxpayer dealt directly with the forger or was the victim once or several steps removed.

■ When a taxpayer receives payment in counterfeit money believing it to be real, he is the victim of a theft by false pretenses whether the immediate passer or a passer several steps removed was the counterfeiter. Section 165 should be equally

applicable to a counterfeit painting. Plaintiff's experts stated that signatures often were added at later dates in order to increase the value of paintings. To deny plaintiff a deduction because Mitscherlich himself did not possess criminal intent would be to draw a distinction between victims that is not commanded by the statute and that is both unwarranted and inequitable.

In a recent decision, the U.S. Court of Appeals for the Ninth Circuit approved precisely this interpretation of the statute. *Boothe v. Commissioner*, 768 F.2d 1140 (1985). There, in 1865 the government had given to Civil War Veteran Dooley certain land rights. In 1898 Dooley assigned his land rights to one Black but, notwithstanding that assignment, in 1916 Dooley again sold his rights to one Mason. In 1951 Mason sold part of such rights to one Davis, and in 1959 the taxpayer then purchased them from Davis' estate for $4,400. After the taxpayer sold such rights to another in 1960, it was ascertained in 1977 that because of Dooley's prior conveyance of the same land to Black in 1898 outside the chain of plaintiff's title the taxpayer's title was void. Under these circumstances, the Court of Appeals held, reversing the Tax Court and adopting the opinion of a dissenting Tax Court judge, that the taxpayer had incurred a $4,400 theft loss in 1959 when he purchased the nonexistent land rights, which was deductible in 1977, the year in which he discovered it. The adopted opinion stated its conclusion on this issue to be (82 T.C. 804, 810): "[T]his petitioner was the victim of a loss arising from theft, even though he was not the immediate purchaser from the fraudulent vendor, Dooley." And that opinion also adopted the analysis of § 165 by another dissenting judge that (*id.*, at 809 and 817):

> The intended direct connection *between the taxpayer and the loss* is clearly expressed in the requirements of section 165(a). Section 165(c)(3) modifies section 165(a) only by requiring that there be a causal connection *between the loss and the theft*. There is, however, no legislative expression of any similar connection *between the taxpayer and the theft*, and we find no reason to infer such requirement. Therefore, petitioner need only prove that he has suffered a loss and that said loss arose from theft. Having carried this burden of proof, he need not demonstrate any direct relationship between himself and the act of theft. (Emphasis in original.)

Here, plaintiff has suffered a loss at the hands of a forger, however distant in time or privity was the forger's act. Plaintiff need not know the identity of the forger. He need only prove that the forgery was the cause of the loss. By his discovery of the forgery, perpetrated by persons unknown, plaintiff has satisfied his burden.

■ We therefore hold that where the taxpayer possesses a forged painting, bearing a false signature, and sustains a loss upon the discovery, the taxpayer is the victim of the theft, and a deduction in the amount of the loss is allowable under I.R.C. § 165(c)(3). Under this analysis, plaintiff is entitled to a deduction for his loss on the forged "Chase" painting, in the amount of $4,600.[2]

■ B. The issue with respect to the "Poussin" is not so readily disposable. Unlike the "Chase", the "Poussin" is unsigned and was merely attributed to Nicolas Poussin by Mitscherlich. There is no forgery, but an erroneous statement by the seller as to the likely artist. Under these circumstances, to find a theft deductible under § 165, it is necessary to determine that Mitscherlich himself defrauded plaintiff by knowingly and intentionally misattributing the painting to Nicolas Poussin.

In support of his burden, plaintiff claims, first, that since Mr. Mitscherlich held himself out and was in fact an experienced art expert, and represented that he had closely examined the "Poussin", he could not have been misled as to the identity of the artist

---

2. The amount of loss claimed is $4,700. Under § 165, a loss is deductible only to the extent that it exceeds $100. Therefore, this amount is adjusted to account for the $100 deductible.

and it may fairly be inferred that his misrepresentation was meant to defraud plaintiff.

In his testimony, however, plaintiff conceded that it took an expert on the work of Poussin to determine that the painting was not an original, and that he could not state that Mr. Mitscherlich had ever held himself out as such an expert. Nor does the record reflect that Mitscherlich was so expert on the 17th century painters generally that he could not honestly err in his judgment as to the attribution of an unsigned work of art executed during that period. Mitscherlich's written statement to plaintiff prepared at the time of sale makes it clear that Mitscherlich was only rendering an opinion as to the artist and explained his evidentiary basis therefor as follows:

> This painting was formerly part of the General J.C. Delafield Collection, New York. It was purchased by Delafield from the Cardinal Fesch collection, Rome in the sale of March 25, 1844 in which it was probably catalogued as a Salvatore Rosa.
>
> Close investigation and scrutiny of both the subject and technique distinctly indicate the work of Nicolas Poussin. The key factor in this determination is the unmistakable Poussin "Trees" depicted on the right-hand side of the canvas. The composition and technique of the leaves are unquestionably the signature/trademark of Nicolas Poussin. The dominance of the landscape dates this painting after 1642, Poussin's second and final visit to Rome, before which time the figures were the dominant forces in his canvases.
>
> The canvas texture and paint medium are definitely 17th century. The painting was in a fair state of preservation but had to be relined and certain restoration performed. However, the important areas remained intact.

Furthermore, it is evident that plaintiff did not rely wholly on Mitscherlich's representation as a warranty as to source before purchasing the painting. Plaintiff testified that prior to the purchase he himself researched Poussin. He read about the artist, examined other Poussin paintings, and investigated at what prices Poussin art work had been sold. He satisfied himself that the painting, although unsigned, certainly was comparable in style to other paintings which were accepted as originals of Nicolas Poussin.

Finally, the statements of the expert upon whom plaintiff relied to establish that the painting was not a Poussin do not support the plaintiff's thesis as to the lack of sincerity and bona fides of Mitscherlich's opinion. James Fack, head of the Old Masters Department of Sotheby Parke Bernet, Inc., in New York City, which specializes in the sale of works of art, concluded that although the painting was not by Nicolas Poussin it was contemporaneously painted by Poussin's nephew, Gaspard Dughet, who took over his uncle's name and closely imitated his style. He also added that

> The present painting is one of the most closely derivative of Nicolas Poussin's landscapes that I have ever seen by Dughet, and I am therefore not surprised that the painting should have been attributed to Nicolas himself.

Second, plaintiff claims that Mr. Mitscherlich's conduct with respect to the sale to plaintiff of seven other paintings proves that he intended to defraud plaintiff on the sale of the eighth (the purported Poussin). This is a very difficult burden to carry.

The argument goes to Mr. Mitscherlich's character. For the inference to be persuasive that the circumstances with respect to the sales of the seven show Mr. Mitscherlich's moral character to be so bad that he could not have been innocent of fraudulent intent on the eighth, the evidence of fraud on the seven must be unequivocal. Unfortunately for plaintiff there is no direct evidence of fraudulent intent with respect to any of the seven. In connection with these sales too, plaintiff relies wholly on inferences. But such inferences are not inescapable, because the evidence does not rule out the possibility that errors in attribution were the result of bad judgment or Mitscherlich himself being misled. More-

over, if Mr. Mitscherlich's moral character were as bad as plaintiff makes out, it is curious that plaintiff was unable to produce evidence of anyone else defrauded by Mitscherlich's business dealings.

Next, Mr. Mitscherlich sold plaintiff a total of 50 paintings, and plaintiff does not claim that Mr. Mitscherlich defrauded him on the sale of the remaining 42. It is not at all clear that misattribution of seven paintings out of a total of 50 is not within the range of what may reasonably be expected of an individual dealer in old paintings, many of which are not signed and have been restored by others.

Finally, even if Mr. Mitscherlich's conduct with respect to the seven were as plaintiff claims, plaintiff still has the burden of proving that Mr. Mitscherlich's intent on the "Poussin" was more in keeping with his conduct on the seven than on the remaining 42.

The first of the seven, a seascape, purportedly signed by James G. Tyler, Mr. Mitscherlich sold to plaintiff in 1970 for $1,500. Although, in 1984, plaintiff's expert determined the signature had been added years after the painting had been completed, he was of the opinion that the painting nevertheless had a value of only $250 less than plaintiff had paid for it. There was no direct evidence that Mr. Mitscherlich either vouched for the authenticity of the signature or knew of the forgery, and the $250 difference in value was hardly sufficient to have motivated fraudulent misrepresentation.

Another of the seven, a painting entitled "Country Scene", Mr. Mitscherlich sold to plaintiff in 1973 for $5,000, with the description that it was initialed by Jasper F. Cropsey, an American artist, and dated 1866. Although in 1984, plaintiff's expert rendered the opinion that it was not painted by Cropsey and was worth only $750, he also stated that the Cropsey painting was "the trickiest [to evaluate] of the bunch, because the signature is so believable and the painting is relatively well executed", and that "this was the closest to being like the artist that it was supposed to be by."

On these facts the inference that Mr. Mitscherlich intended to defraud the plaintiff on the Cropsey painting is merely speculative.

A third painting among the seven was entitled "Woman with Reel" and bore the signature Gerald Dou. Mr. Mitscherlich sold it to plaintiff in 1973 for $11,500. In 1984 plaintiff's expert informed him it was not by Dou; but the same witness conceded that it had in fact been painted in the 17th century, in Dou's lifetime, and was probably done by one of his students. Thus, Mr. Mitscherlich could readily have been honestly mistaken, and such evidence likewise provides no persuasive evidence bearing on Mr. Mitscherlich's moral character.

In 1973 Mr. Mitscherlich sold to plaintiff a fragment of a painting entitled "Portrait of a Woman", purported to be by Peter Paul Rubens, for $5,000, which plaintiff resold in 1982 for only $600. But any inferences which might be drawn from this as to Mr. Mitscherlich's character are clouded by the absence of evidence as to other pertinent circumstances. Plaintiff's expert witness testified that Rubens not only painted whole paintings but painted parts which his students finished, and there was a circle around his school which painted in his style. We are not told as to which of these the fragment of a painting was, nor how and why the fragment was separated from the rest. The evidence was also that the fragment required extensive restoration work, but the record does not reflect its condition at the time of sale. Thus, again the foregoing facts are not necessarily inconsistent with Mr. Mitscherlich having acted in accordance with an honest opinion, and the court is not persuaded that this necessarily reflects adversely on Mr. Mitscherlich's moral character.

Plaintiff also refers to a pair of seascapes he bought from Mr. Mitscherlich in 1971 for $1,500, purported to be by William Trost Richards, and which was resold in 1982 for a mere $127.50. Plaintiff's expert testified that a real Richards would not have sold for so little. But the witness had not seen the paintings, the sale was at a

local auction in upstate New York, and the record does not reflect whether or not the sale was made to knowledgeable bidders. Thus, again, it is difficult to draw any inference as to Mr. Mitscherlich's character from these circumstances.

Plaintiff included in the seven an unsigned painting entitled "A Morning in Colorado (Indian Encampment)", which Mr. Mitscherlich claimed had been painted in 1863 by Albert Bierstadt, a prominent American landscape painter, and for which plaintiff paid Mr. Mitscherlich $5,500. Plaintiff's expert witness agreed it was painted about that time but was emphatic that it was not by Bierstardt and was not of his quality. He valued it at only $750 purely for its decorative features. However, he did not refute at all Mr. Mitscherlich's statements in the invoice that it had come from a named New York private collection and that a related painting was displayed in the Boston Museum of Fine Arts. Thus, even if the witness was correct, Mr. Mitscherlich could have relied upon the two collections as a basis for his opinion without any intent to defraud plaintiff.

The facts with respect to the purported Chase painting similarly may not be deemed to provide a clear cut basis for impugning Mr. Mitscherlich's moral character, which could carry over to and provide a ground for the conclusion that he intended to defraud plaintiff on the sale of the "Poussin." Plaintiff's expert reported that "there is a remote possibility that * * * [it] * * * was actually executed by Chase, but that it has since undergone such drastic 'restoration' that his hand is no longer visible."

Nothing in Mr. Mitscherlich's background generally supports the view espoused by plaintiff that he was a confidence man, engaged in a regular pattern of fraudulent conduct. Mr. Mitscherlich had studied art at Heidelberg and Munich universities in Germany. After completing his education, he was an international and European representative for Sotheby's in London for about 7 years. He worked on commissions, buying and selling artworks mostly in Europe. During that time, he was decorated with the Legion of Honor by France for having found the letters of Marie Louise to Napoleon.

When he immigrated to the United States in 1937, Mr. Mitscherlich did not continue to deal in art. He drove a cab. After the war, when he was again in contact with his old clientele, he resumed his sales and restoration work, initially and for many years operating his business out of his home in New York City, and in later years from a studio in Greenwich, Connecticut. He never operated a storefront open to the public but relied exclusively on his good reputation and references from one client to another in order to make a living in his field.

Mitscherlich's daughter, a witness for the defendant, testified that her father's reputation for integrity and honesty was "fabulous." She also testified as to her father's association and reputation with several art galleries. While, of course, this testimony was by an interested witness, it was not impeached in any way. Nor did plaintiff introduce any evidence of his own regarding Mitscherlich's reputation in the art community. Indeed, as already mentioned, plaintiff offered no evidence that any other person ever claimed to have been defrauded by Mr. Mitscherlich.

Other evidence inconsistent with plaintiff's scenario that Mr. Mitscherlich was engaged in a regular pattern of sales under false pretenses may be found in the fact that Mitscherlich often permitted plaintiff (as well as his other customers) to take home paintings in which he was interested and retain them for several weeks while deciding finally whether or not to purchase them. In addition, on a dozen occasions, even after purchase, Mitscherlich allowed him to return paintings, giving credit for the full purchase price. In some instances, returns were made in exchange for other paintings. This practice obviously permitted any client of Mr. Mitscherlich to verify any of the seller's representations before or after sale.

The very circumstances leading to the "Poussin" purchase tend to be inconsistent with plaintiff's claim that Mr. Mitscherlich schemed to defraud him on the purchase. On April 8, 1972, plaintiff paid $30,000 for a painting entitled "The Blind Leading the Blind", which Mitscherlich attributed to Pieter Bruegel, the Elder. The invoice set out the history of the painting, a description of its physical state and Mitscherlich's basis for attributing the work to Bruegel. Shortly thereafter, on his own initiative, Mitscherlich contacted plaintiff and voiced doubt about whether the painting was painted at the beginning of the 16th century or 50 years later, and whether the painting was an original by Bruegel or by a painter of the same school. He advised plaintiff to return the painting and gave him a $30,000 credit. They discussed an exchange for one of two other paintings, but one became unavailable and plaintiff rejected the other. On June 27, 1972, plaintiff used the credit to purchase the "Poussin." Had Mitscherlich intended to defraud plaintiff, he would not have had to initiate the return of the Bruegel painting; he already had plaintiff's money in hand, and plaintiff did not suspect the painting was not an authentic Bruegel. Plaintiff claims such conduct might well have been part of a larger fraudulent scheme, but plaintiff has not proven this allegation.

Finally, plaintiff's case suffers from the fact that he offered no evidence surrounding Mitscherlich's procurement of the "Poussin" painting. Mitscherlich informed plaintiff as to his source of the painting, that it had been part of a family collection since 1844 and that he purchased it from that family at the time he sold it to plaintiff. The information provided by the prior owner might have provided direct evidence as to what Mitshcerlich did or did not know about the painting at the time he acquired it. It must be concluded, therefore, that such evidence would not have been helpful to plaintiff.

■ Accordingly plaintiff is not entitled to the $29,000 deduction for theft in connection with his acquisition of the "Poussin" painting.

### IV.

Defendant took the position initially that plaintiff was not entitled to any deduction, even assuming a theft, because plaintiff never attempted to bring a claim against Mitscherlich and could not show therefore that in 1976 and 1977 he had no reasonable prospect of recovery. In its brief after trial, defendant has not reargued this point, and perhaps has abandoned it. In any event, the evidence of record shows that here is no factual basis for the defense.

■ Section 165(c)(3) states that theft losses are deductible to the extent they are not compensated by insurance or otherwise. This requirement means that a taxpayer must have no reasonable recourse or prospect of recovery before he can claim a deduction. *Parmelee Transportation Co. v. United States*, 173 Ct.Cl. 139, 351 F.2d 619 (1965); *Juniper Investment Co. v. United States*, 168 Ct.Cl. 160, 338 F.2d 356 (1964). But the courts have not demanded futile efforts. *Schneider v. Commissioner*, T.C.M. 79–355, ¶ 79, 355 P–H Memo T.C. (1979).

In this case, plaintiff argues that no claim was made because Mitscherlich was an invalid at the time plaintiff discovered the losses, supported by his children, living with his daughter, and impoverished by outstanding medical bills stemming from an accident in early 1976. Plaintiff contends that under those circumstances he could not in good conscience have brought a claim. To rebut that a claim was futile, defendant points to Mitscherlich's continued ownership of several paintings and his mental capacity to conduct business after the accident.

■ It is concluded that on the evidence of record plaintiff is correct. Mitscherlich's daughter testified that his property was worth at most $20,000, but some of it was given by Mitscherlich to his children in exchange for their care of him and some was sold to pay medical bills both for

Mitscherlich himself and for his wife, who died as a result of the same accident. Moreover, plaintiff would have been but one among many creditors claiming against Mitscherlich. When he did claim against the estate, Mitscherlich's daughter as executrix said the estate had insufficient assets to satisfy these claims. Futility was not an unreasonable conclusion, and forebearing a claim prior to Mitscherlich's death is thus no bar to allowing the deduction.

### Conclusion

Judgment will be entered for plaintiff in accordance with this opinion. The parties are allowed 30 days to file a stipulation as to the amount of such judgment, failing which, on the motion of either party, the court will initiate proceedings to determine the amount thereof.