T.C. Memo. 1996-58


UNITED STATES TAX COURT


ESTATE OF PHILIP MERIANO, DECEASED, ANITA PANEPINTO,
ADMINISTRATRIX, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent.


Docket No. 26622-81.      Filed February 15, 1996.


<u>James S. Tupitza</u> and <u>Ridgeley A. Scott</u>, for petitioner.

<u>Joellyn Cattell</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


DAWSON, <u>Judge</u>:  This case was heard by Special Trial Judge
Daniel J. Dinan pursuant to the provisions of section 7443A(b)(4)

and Rules 180, 181, and 183.[1]  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

DINAN, Special Trial Judge:  Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $732,106.81 and an addition to tax of $366,053.41 for fraud pursuant to section 6653(b).

Many of the issues have been settled by the parties pursuant to a Stipulation of Disposition of Issues filed September 3, 1985, and a Second Stipulation of Disposition of Issues filed November 26, 1993.

The issues remaining for decision are:  (1) Whether petitioner is entitled to a theft loss deduction of $274,505.09 for Federal estate tax purposes; and (2) whether petitioner is entitled to deduct for Federal estate tax purposes legal fees of $193,004.43 allegedly paid to the law firm of Tupitza and Marinelli for services performed from August 1990 through December 1994.[2]

---

[1]  All section references are to the Internal Revenue Code in effect as of November 14, 1977, the date of decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  The invoices for legal fees introduced into evidence at trial (Exs. 17-Q and 47) show petitioner may have overpaid legal fees by $3,095.57.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated herein by this reference.

Philip Meriano (Philip or decedent) died on November 14, 1977. At the time the petition was filed, Mary Orlando, who was then administratrix of the Estate of Philip Meriano, resided in the Commonwealth of Pennsylvania.

On July 6, 1977, a fire occurred at the residence-office of decedent that destroyed many of his personal business records. The Philadelphia Fire Department and the Philadelphia Police Department determined that the fire was caused by arson. On September 1, 1977, Philip told the Philadelphia Police Department that $2 million in bonds and securities were missing from the safe in the area of the residence-office that was destroyed by the fire.

The Philadelphia Police Department, the Federal Bureau of Investigation (FBI), and the U.S. Attorney's Office in Philadelphia commenced an investigation to locate the stolen bonds and securities but were unsuccessful. They terminated their investigation on November 29, 1977, after decedent's death.

At the time of Philip's death, it was thought that he had died intestate. He was survived by his sister, Mary Orlando, and his brother, James Meriano. On December 6, 1977, Mary Orlando filed a petition for letters of administration with the Register

of Wills, Philadelphia, seeking to be appointed administratrix of Philip's estate.  The Register granted letters of administration to Mary Orlando on or about December 6, 1977.  She served as administratrix of the estate until August 31, 1982.

From the time of decedent's death until the middle of 1978, Anthony Orlando, Mary Orlando's husband, unsuccessfully attempted to locate the securities stolen from Philip.  Anthony Orlando was introduced to Edward J. Reardon, Jr. (Reardon), who was a stock broker with Merrill, Lynch, Pierce, Fenner & Smith.  Anthony Orlando asked Reardon to conduct an investigation to see if the stolen securities could be located.

Reardon began an investigation during which he learned about John T. Lynch Jr. (Lynch), an attorney and investment banker who had considerable experience in the municipal bond and finance field.  He contacted Lynch because he thought Lynch's experience would be helpful in locating the stolen securities.

Reardon introduced Lynch to the Orlandos and Connie Kates, the Orlandos' daughter.  Following negotiations among the Orlandos, Connie Kates, and Lynch, on August 7, 1978, Lynch and Mary Orlando, as administratrix of the estate, signed an agreement, whereby Lynch was hired to locate the stolen securities.  The agreement provided that Lynch would receive 33-1/3 percent of the face value of any securities recovered if they were recovered prior to suit.  Otherwise, Lynch was to receive 40 percent of the face value of any securities recovered if they

were recovered after filing suit. The agreement was witnessed by Anthony Orlando and Connie Kates. When Lynch signed the agreement with the estate, he was working as an investment banker in New York issuing municipal securities. An attorney by the name of Frank Carano was the attorney for the estate.

Shortly after Lynch signed the agreement with Mary Orlando on August 7, 1978, Lynch entered into an agreement with Reardon whereby Reardon agreed to assist Lynch in the investigation to see if the stolen securities could be recovered. Reardon was to be paid 15 percent of the face amount of any securities recovered.

Through their diligent investigative efforts, Lynch and Reardon discovered, in approximately March 1979, that coupons from securities that they identified as having belonged to decedent were being cashed at various banking institutions in San Diego, California. They traced the securities to an account in San Diego held in the name of Italia Ballestrucci, the maiden name of Italia Bossi who had been the housekeeper for Philip when his residence-office was set afire on July 6, 1977.

Lynch and Reardon took their evidence to the U.S. Attorney and the FBI in Philadelphia and persuaded them to reopen their investigation of the theft of securities from Philip.

Italia Bossi and her husband were arrested by the FBI at their home in San Diego on May 1, 1979. Bearer bonds having a

face value of $1,823,000[3] were confiscated from the Bossis'
residence at the time of their arrest.  The Bossis were returned
to Philadelphia for trial.

The trial of the case began in November 1979, before the
Honorable John B. Hannum in the U.S. District Court for the
Eastern District of Pennsylvania.  The jury was unable to reach a
verdict, and Judge Hannum declared a mistrial on November 27,
1979.

In December 1979, Lynch retained the law firm of Groen,
Smolow and Lynch (the law firm) to act as co-counsel to file any
civil suits that might be necessary to protect the estate in the
event the U.S. Attorney declined to reprosecute the Bossis.  The
"Lynch" in the name of the law firm was Lynch's brother, James E.
Lynch.  In January 1980, Mary Orlando, as administratrix of the
Estate of Philip Meriano, dismissed Frank Carano as general
counsel for the estate.  At that time, the law firm became
general counsel for the estate.

On January 16, 1980, the U.S. Attorney moved the court for
leave to dismiss the indictment against the Bossis on the ground
that the United States did not believe that further prosecution
was warranted.  The motion was granted.  Immediately thereafter,
the Bossis filed a motion in Federal court asking the court to
order the United States to return to them the $1,823,000 in

---

[3]     Some of the securities were other than bearer bonds.

bearer bonds seized by the FBI.  Lynch and the law firm then filed three civil actions in the U.S. District Court for the Eastern District of Pennsylvania to recover the allegedly stolen securities.

In April 1980, the civil litigation for the recovery of the stolen securities was settled.  Pursuant to the settlement agreement, the estate was to receive securities in the face amount of $1,623,000.

On April 8, 1980, the law firm rented a safety deposit box at Provident Tradesmens Bank & Trust Co. in Philadelphia.  The signature card for the safety deposit box was signed by Marcel Groen, Ronald Smolow, and Lynch.

The United States Attorney's office inventoried the securities in the Government's possession that were to be turned over to the estate pursuant to the settlement of the litigation between the Bossis and the estate.  The securities were delivered to Lynch and Anthony Orlando who deposited them in the safety deposit box at the Provident bank on April 10, 1980.  Also, on April 10, 1980, Lynch and Reardon signed the following agreement:

### HOLD HARMLESS AND INDEMNITY AGREEMENT

Dated as of this 10th day of April, 1980, in consideration of the disbursement of certain funds deemed earned as professional fees pursuant to prior agreements with Mary Orlando, in her capacity as the duly appointed Administratrix of the Estate of Philip Meriano, Edward J. Reardon, Jr. and John T. Lynch Jr., Esquire, agree(s) to INDEMNIFY AND HOLD HARMLESS the Estate of Philip Meriano and Mary Orlando, the Administratrix of the Estate against any and all claims

and loss, which the Estate and/or the Administratrix may hereafter suffer or pay by reason of any claims against the Estate or the Administratrix or as a result of the disbursement of said funds of the Estate in payment of professional fees and hereby agree to repay any and all amounts received that are determined by a court of proper jurisdiction to be returnable to the Estate.

Edward J. Reardon Jr. and John T. Lynch Jr. do(es) hereby further agree(s) to provide legal representation or the reasonable cost thereof to defend against any claim which may be brought against the Estate or the Administratrix as a result of the disbursement of such fees including all incidental costs relating thereto.

IN WITNESS WHEREOF we have hereunto set our hand and seal dated as of this 10th day of April, 1980.

/s/
Edward J. Reardon, Jr.

/s/
John T. Lynch Jr., Esquire

Sometime prior to April 29, 1980, an account was opened in the name of the estate at Kidder, Peabody & Co. in Philadelphia. The securities remaining in the safety deposit box were again inventoried and transferred to the Kidder, Peabody account. On April 29, 1980, Mary Orlando, as administratrix of the estate, authorized Lynch, as her agent, to buy, sell, and trade in the securities in the estate's Kidder, Peabody account.

At about the same time the estate opened its account at Kidder, Peabody, Lynch and Reardon also opened their own personal accounts at Kidder, Peabody. Those accounts were used to

liquidate securities transferred to them from the estate's account as payments for their fees.

During the time he had control of the bonds, Lynch sold some of them and used the proceeds to pay Reardon and himself the fees they earned pursuant to their August 7, 1979, agreement with the estate.  He also sold securities and used the proceeds to pay the law firm $95,000--$50,000 for their legal services in the Bossi litigation and $45,000 for other legal services performed as general counsel for the estate.  A total of $720,761.19 was disbursed to Lynch and Reardon.

In August 1980, Anita Panepinto (Panepinto), a niece of Philip Meriano's deceased wife, found a will dated November 17, 1973, and a codicil dated December 2, 1973, that had been executed by Philip.  The will and the codicil named Panepinto and Elaine Hernardi (Hernardi), another niece of Philip's deceased wife, as beneficiaries of the entire estate.

On or about August 30, 1980, Panepinto presented the will and codicil to the Register of Wills in Philadelphia for probate.

On December 9, 1980, Mary Orlando, as administratrix of the estate, filed a petition with the Orphans' Court Division, Court of Common Pleas of Philadelphia (the Orphans' Court), seeking approval of the fees paid by the estate to Lynch and Reardon. Action on the petition was deferred by the Court until the accounting to be filed by the estate was audited by the court.

On March 24, 1981, Mary Orlando, as administratrix of the estate, approved the payment of fees by the estate to Lynch in the amount of $418,250 and to Reardon in the amount of $250,950. The approval was witnessed by Anthony Orlando and Connie Kates.

During the latter part of 1981, the relationship between Lynch and the law firm deteriorated. The law firm was seeking additional fees from Lynch for its participation in the litigation to recover the bonds. On or about December 10, 1981, the law firm informed Anthony Orlando that it would no longer represent the estate.

On August 31, 1982, the Register of Wills revoked the letters of administration issued to Mary Orlando on or about December 6, 1977. The will presented to the Register of Wills by Panepinto on August 30, 1980, was admitted to probate. On September 1, 1982, Panepinto was appointed Administratrix, c.t.a. of the Estate of Philip Meriano. On September 3, 1982, Panepinto filed a petition with the Orphans' Court seeking possession of all the estate's assets and documents and demanded an accounting.

On March 30, 1983, Panepinto filed a petition with the Orphans' Court for a citation directing Lynch to deposit with the court the professional fees paid to him by the estate which Panepinto claimed to be grossly excessive. Panepinto also filed a petition for a citation directing Reardon to deposit with the Court the fees paid to him by the estate which Panepinto also claimed to be grossly excessive. Similar petitions for citations

were made by Panepinto as to Mary Orlando and Connie Kates. All such petitions for citations were denied.

On July 28, 1983, Mary Orlando, as the prior administratrix of the estate, and Connie Kates, as Administratrix of the Estate of James Meriano, the late brother of decedent, filed an appeal from the decree of the Register of Wills which admitted the will and codicil of Philip Meriano to probate and which granted letters of administration to Panepinto.

Panepinto retained the services of the law firm of Dilworth, Paxson, Kalish and Kauffman of Philadelphia (the Dilworth law firm) to represent her in the will contest litigation. The firm also became the legal representative for the estate.

In response to the petition filed on September 3, 1982, by Panepinto with the Orphans' Court seeking possession of all of the estate's assets and documents and demanding an accounting by Mary Orlando, the Orphans' Court issued a citation to show cause why Mary Orlando should not file an account for the estate.

On November 4, 1982, the Orphans' Court issued a decree directing Mary Orlando to file an accounting within 30 days. In January 1983, Mary Orlando had still not filed the required accounting.

The Insurance Company of North America (INA) was surety on Mary Orlando's administratrix bond.

After she was appointed administratrix of the estate on September 3, 1982, Panepinto filed claims against INA, as surety

for Mary Orlando, stating that the estate had illegally distributed moneys to Mary Orlando and others. The alleged illegality was premised on her representation that she was the lawful beneficiary of the estate. She also claimed that all fees paid out to Lynch and Reardon had to be returned to the estate.

In approximately January 1983, INA retained attorney Robert Boote (Boote) of the law firm of Wolf, Block, Schorr and Solis-Cohen, Philadelphia, to prepare and file an account of the estate with the Orphans' Court for INA in its capacity as surety.

Boote determined that there were no organized records maintained by the estate. Boote assumed that Lynch was the attorney for Mary Orlando, as administratrix of the estate, although he never saw any document to confirm that assumption. He did, however, see the agreement of August 7, 1978, between Mary Orlando, as administratrix of the estate, and Lynch pursuant to which Lynch had been hired to recover the stolen securities.

Boote requested Lynch to provide him with records of the estate that would enable Boote to prepare an account for the estate. Lynch was not forthcoming in providing Boote with estate records and the records that Boote did obtain from Lynch were disorganized and not very helpful to Boote in his task of preparing an account. Boote's law firm had an estate accounting department, and he assigned an experienced estate accountant to request records from their original sources such as brokerage houses and banks and to work with the estate's accountant at the

Dilworth law firm, which was the law firm that represented Panepinto as administratrix of the estate, to determine from original records what had come into the estate, what had gone out of the estate, and where it had gone.

Boote referred Mary Orlando to an attorney and when the account was filed with the Orphans' Court, she was represented by Leonard S. Abrams.

As of March 30, 1983, Boote had prepared a First and Final Account of Mary Orlando, Administratrix (the account), covering the period November 14, 1977, to September 1, 1982, showing a combined principal and income balance remaining in the estate of $861,553.73.

The account, which was filed with the Orphans' Court on March 31, 1983, listed as disbursements from the estate, fees paid to Reardon in 1980 of $220,000, and fees paid to Lynch in 1980, 1981, and 1982 of $415,761. The account further noted that the status of an asset of the estate, a $50,000 U.S. Treasury Note, 8 percent due February 15, 1983, was still to be determined.

On April 30, 1986, INA as surety, filed an Amendment to the Account[4] showing that the $50,000 U.S. Treasury Note which was not accounted for in the account filed March 31, 1983, had been redeemed by Lynch. The amendment to the account also corrected

---

[4] The Amendment to the Account was not made a part of the record.

the account to show that Lynch was to be charged with $15,000 in Delaware River Bonds, $10,000 in California Toll Bridge Bonds, and $5,061 of coupons.  A total of $500,761.19 in disbursements was charged to Lynch.

It is common practice in the Commonwealth of Pennsylvania for fiduciaries, personal representatives, executors and/or administrators to pay money out of an estate for lawyers fees, distributions to beneficiaries, etc., without court approval in an accounting but such payments are made "at risk", i.e., one runs the risk that if the payments are not approved by the court in an accounting, the payments and/or distributions will have to be returned to the estate.

On December 26, 1985, Mary and Anthony Orlando and their daughter, Connie Kates, individually and as executrix of the estate of James Meriano, the deceased brother of Philip, executed a stipulation and family settlement agreement with Panepinto, individually and as administratrix c.t.a. of the Estate of Philip Meriano and INA.  Under the terms of the agreement, Panepinto and Hernadi and the Estate of Philip Meriano relinquished their rights to file a surcharge action against Mary Orlando and her surety, INA.[5]

---

[5]     The stipulation and family settlement agreement was not made a part of record.

On December 19, 1986, Mary Orlando and Connie Kates withdrew their will contest, and the Orphans' Court approved the stipulation and the family settlement agreement.

The First and Final Account of Mary Orlando, Administratrix, As Stated By Insurance Company of North America, Surety and Amendment to First and Final Account of Mary Orlando, Administratrix, was called for audit May 2, 1986, to March 24, 1987, inclusive, in the Orphans' Court before Judge Shoyer, the auditing Judge.

Stephen J. Mathes and John R. Latourette, Jr. of the Dilworth law firm represented Panepinto; Leonard S. Abrams represented Mary and Anthony Orlando, individually, and Connie Kates as executrix of the estate of James Meriano; Frances Sullivan represented Lynch; Joseph Moore represented Reardon and Joseph M. Gindhart represented Marcel Groen and the Groen and Smolow law firm.

Judge Shoyer had before him the petition filed by Panepinto to reduce or deny all fees that had been paid out of the estate to Lynch and Reardon.  She claimed that the contingent fee agreement upon which Lynch and Reardon based their claim was unconscionable as a matter of law and that the fees claimed under the agreement were excessive and unreasonable as a matter of law.

On November 10, 1983, Lynch filed with the Orphans' Court a petition for a citation directed to Marcel Groen and Ronald Smolow to show cause why they should not deposit with the court

the money paid to them by Lynch pending approval of the payments by the court.

After 14 hearings during the period May 2, 1986, to March 24, 1987, Judge Shoyer entered an adjudication on September 21, 1988. Judge Shoyer opined that the method Lynch followed in removing bonds and coupons from the estate and his failure to maintain adequate records of such transactions was a breach of ethical standards. He stated, however, that the court was not disposed to penalize Lynch for his several violations of the ethical rules but would leave the disposition of such ethical considerations to the Disciplinary Board of the Supreme Court of Pennsylvania, and he referred the record of the Orphans' Court to the Disciplinary Board. There is no evidence in this record that the Disciplinary Board ever took any action on the referral.

Judge Shoyer stated that in endeavoring to arrive at a reasonable and fair fee, he was most conscious of the fact that had it not been for Lynch and Reardon, there would be nothing for the parties before him to fight about. He found that a reasonable contingent fee for Lynch and Reardon should be based on a percentage of the fair market value of the recovered stolen bonds. He first noted that there was no allegation by Panepinto of any impropriety by Reardon.

Reardon admitted that he had received $250,950 from Lynch in payment of the investigatory work which he had performed. Judge Shoyer found that Reardon was entitled to 15 percent of

$1,146,446 (the fair market value of the recovered stolen bonds) or $171,966.90. He surcharged Reardon the excess of $78,983.10 plus 6 percent interest from the dates he received moneys from the estate, i.e., $28,033.10 on May 7, 1980, $20,000 on June 17, 1980, and $30,950 on April 15, 1981. Reardon was to be given credit for any portion of his surcharge which might be paid by Lynch on Reardon's behalf and so designated at the time of payment.

Judge Shoyer next found that $95,000 had been paid by Lynch to Groen and Smolow. There was no controversy about the first $50,000 which Lynch had said was payable out of his fees in connection with the litigation to compel recovery of the stolen bonds from the Bossis. Controversy still existed, however, as to the remaining $45,000 which Lynch paid them as an alleged general obligation of the estate for estate work performed by Smolow. After reviewing the record, Judge Shoyer surcharged Groen and Smolow $1,230 plus 6 percent interest from May 14, 1980, when Lynch withdrew the $45,000 from the estate. Groen and Smoler were given credit for any portion of their surcharge which might be paid by Lynch on their behalf and so designated at the time of payment.

Finally, because of Lynch's failure to cooperate with Boote in the preparation of the surety's account for the estate, Judge Shoyer reduced his fee from 40 percent to 35 percent of the fair

market value of the recovered stolen bonds; i.e., 35 percent of $1,146,466 or $401,256.10.

In the Amendment to the Account filed by Boote with the Court on April 30, 1986,[6] a total of $500,761.19 was credited to Lynch.

Judge Shoyer surcharged Lynch the difference between $500,761.19 (the amount retained by Lynch after his payment of $220,000 to Reardon) and $401,256.10 for a surcharge of $99,505.09.  He also specifically surcharged Lynch $7,500 which Lynch had advanced for "costs" on February 16, 1980, because Lynch never properly accounted for the claimed "costs".

Panepinto, Lynch, and Reardon took exceptions to Judge Shoyer's Adjudication of September 21, 1988, and the matter was heard by the Orphans' Court sitting en banc.

On August 1, 1989, Judge Pawelec issued the Opinion and Order of the Orphans' Court, sitting en banc.  The Opinion and Order provided, inter alia, as follows:

THE AMOUNT OF THE "SURCHARGES" ENTERED AGAINST LYNCH
AND REARDON, THE ALLOWANCE OF CREDITS TO LYNCH FOR
PAYMENTS TO OTHERS, AND THE INTEREST TO BE PAID ON
THE "SURCHARGES"

It is apparent from a review of the briefs and the arguments of counsel for the exceptants that they are unclear concerning the exact amount of the "surcharges" imposed by the auditing judge upon Lynch and Reardon, the credits, if any, to be allowed Lynch for his payments to others, and the interest to be paid on the surcharges by Lynch and Reardon.  To allay counsels'

---

[6]     See supra note 4.

confusion, the Court en banc will review certain of the actions taken by Lynch and restate certain portions of the adjudication.

It is undisputed that all of the payments made to anyone connected with the recovery of the bonds were made by Lynch.  Upon his recovering the bonds, Lynch took control of them and from the proceeds disbursed a total of $720,761.19.  He made a wire transfer from his Kidder, Peabody account to Reardon's Kidder account in the amount of $220,000, leaving Lynch with $500,761.19.  He then paid Reardon an additional $30,950.00, which made Reardon's total receipts the sum of $250,950.00, and which left Lynch with $469,811.19.

From the $469,811.19, Lynch paid the law firm of Groen & Smolow, Esquires, $95,000, and paid an additional $7,500 in costs.  Of the $95,000 payment to the law firm, Lynch allocated the payment $45,000 for general services to the estate on behalf of Orlando and $50,000 for services to him in connection with the recovery of the bonds.  He does not contend that he should be allowed a credit for the $50,000 payment and agrees that it is an expense he must bear from his fee. He does contend, however, that he should have been given credit for the payment of $45,000.  Deducting the $45,000 payment and the $7,500 payment, Lynch was left with a total of $417,311.19.

Of the payments made after the wire transfer of $220,000 to Reardon, the auditing judge disallowed him a credit of $7,500 because he was unable to itemize those costs.  We find no error in that disallowance. However, the auditing judge did not allow Lynch any credits for the payment of $45,000 to Groen & Smolow, which payment the auditing judge found to be a legitimate estate expense, and for the additional payment of $30,950 to Reardon.  The auditing judge's failure to allow Lynch credits for those payments was error and has affected the total amount of the money which Lynch must refund to the estate.

In his adjudication, the auditing judge found that a reasonable fee for Lynch is $401,256.10, or 35% of the market value of the bonds he recovered.  The auditing judge then "surcharged" Lynch the difference between $500,761.19 (the amount remaining to Lynch after the $220,000 transfer to Reardon) and $401,256.10, for a total surcharge of $99,505.09.

However, Lynch should have been given credit for the payments of $30,950 to Reardon and $45,000 to Groen & Smolow. After being given credit for those payments, the amount of the "surcharge" should have been based upon the difference between $424,811.19 (i.e., $500,761.19 less $30,950.00 and less $45,000.00) and $401,256.10, or $23,559.09. That figure is the amount of the refund Lynch must make as a result of the overpayment of his fee.

Concerning Reardon's fee, the auditing judge allowed him a fee of 15% of the market value of the bonds recovered or the sum of $171,966.90. He therefore "surcharged" Reardon the difference between the amount paid to him by Lynch, i.e., $250,950.00, and the fee he found to be reasonable, for a total "surcharge" of $78,983.10. We find no error in the auditing judge's finding and dismiss the exception.

However, the auditing judge was unmindful of the fact that Reardon had been totally compensated by Lynch for his services. When Lynch made the two payments to Reardon, totaling $250,950.00, Reardon had received the benefit of his bargain with Lynch. That is to say, Reardon was paid by Lynch in accordance with the terms of the contract he entered into with Lynch. In fact, Reardon received somewhat more than 15% of the face value of the bonds recovered.

Even after refunding the full amount of the surcharge, Reardon is left with $171,966.90. His fee, when added to Lynch's allowed fee of $401,256.10, makes a total fee for services of $573,223.00. That amount is exactly 50% of the total market value of the assets recovered by Lynch and Reardon.

Although the auditing judge does not expressly address the issue, it is clear from the amounts of compensation awarded to Lynch and Reardon that he found that Lynch was to receive 35% of the market value of the bonds and that Reardon was to receive 15% of the market value of the bonds and that each man was compensated from the gross estate. We are of the opinion that an allowance of 50% of the market value of the assets recovered is unreasonable and excessive and was error for the auditing judge to allow that amount of compensation.

We are of the opinion that under all of the facts and circumstances of this case a fair and reasonable fee would be a total of 35% of the market value of the bonds recovered, with Lynch to be responsible for the payment of Reardon's fee of 15% of the market value of the bonds recovered. As a result, Lynch must refund to the estate the full amount of the compensation allowed by the Court to Reardon. That is, Lynch must refund the amount of $171,966.90 to the estate. In addition, because Lynch paid Reardon's fee from estate assets without any authority and because of our finding that the amount of compensation taken by Lynch and Reardon and allowed by the auditing judge is unreasonable and excessive, Lynch must pay interest on the $171,966.90 refund at the rate of six percent from the date of payment to Reardon until the date of the refund. Lynch made the payment at his peril and deprived the estate of the opportunity to earn interest on the money. It is only fair that he now make the estate whole for the estate's loss.

The $171,966.90 refund is, of course, in addition to the refund of $23,559.09 which he must make on account of the overpayment of his own fee.

Concerning the interest to be paid on the surcharges imposed by the auditing judge on Lynch and Reardon, it is apparent that the auditing judge imposed interest on the full amount of the money he found that Lynch received without subtracting from that amount the amount of the compensation he found to be reasonable. It was clearly error for the auditing judge to find Lynch liable for the payment of interest on the full amount of the money he found Lynch to have received. Lynch's obligation for interest runs only on the difference between the amount of money he took as his fee and the amount of his fee which the auditing judge found to be reasonable. That is, he need only pay interest on the sum of $23,559.09 at the rate of six percent from the time of receipt until the time of refund.

Following the issuance of the Orphans' Court's opinion and order on August 1, 1989, all parties appealed Judge Pawelec's order to the Superior Court, which affirmed the order on June 13, 1990.

Lynch then filed a petition for the allowance of an appeal to the Pennsylvania Supreme Court. His petition was denied on January 15, 1991.

Sometime during the latter part of 1989 or the first part of 1990, Reardon entered into a settlement agreement with the estate and paid to the estate $25,000 in accordance with the terms of the settlement.[7]

On August 29, 1989, Lynch filed a petition in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania, pursuant to chapter 13 of title 11, United States Code. In his petition, Lynch acknowledged his indebtedness and listed the Estate of Philip Meriano as a judgment creditor in the amount of $225,000.

When Lynch filed his petition in bankruptcy on August 29, 1989, the estate was still being represented by the Dilworth law firm. Marjorie Obod (Obod), an associate with the Dilworth firm, received an incomplete record of what was filed with the bankruptcy court by Lynch.

Obod then filed a proof of claim with the bankruptcy court for the estate as a judgment creditor of Lynch because of the surcharge imposed by the Orphans' Court against him. Shortly thereafter, the Dilworth firm ceased to represent the estate and took no further action against Lynch.

---

[7] The settlement agreement was not made a part of the record.

Lynch's bankruptcy petition was dismissed by the bankruptcy court on August 22, 1990, because of the failure of the bankruptcy estate to file required schedules. After the Pennsylvania Supreme Court denied Lynch's petition for appeal on January 15, 1991, no one on behalf of the estate again contacted him about the judgment owed by him to the estate.

The Dilworth firm first represented Panepinto in the will contest with Mary Orlando, as the prior administratrix of the estate, and Connie Kates as administratrix of the Estate of James Meriano, in about July 1983. The firm then represented Panepinto as the administratrix of the Estate of Philip Meriano.

On October 19, 1983, John R. Latourette, Jr. (Latourette), of the Dilworth firm filed with this Court an entry of appearance. On November 7, 1983, Latourette filed a motion to substitute Panepinto as administratrix of the estate, and the motion was granted on November 14, 1983.

On April 25, 1983, this Court set this case for trial on September 30, 1985, at Philadelphia.

On September 3, 1985, Latourette and counsel for respondent filed with the Court a Stipulation of Disposition of Issues (the First Stipulation), which provides:

### STIPULATION OF DISPOSITION OF ISSUES

In order to resolve the issues before this Court in the above-captioned case, the below-signed parties agree to stipulate the tentative settlement of all issues raised in the notice of deficiency upon which this case is based, and all issues raised in the

Petition, Answer and Reply filed in this case.  A final Decision cannot be filed in the case at this time only because the resolution of certain issues that have been stipulated below are dependent upon the final resolution of certain matters now before the Court of Common Pleas of Philadelphia County, Pennsylvania, Orphans' Court Division, Administration No. 2259 of 1978, Estate of Philip Meriano.  Once these issues are resolved, the tentative settlement stipulated below will be incorporated in a final Decision document to be filed with this Court.

In accordance with an agreement reached between the parties, the parties agree as follows:

1.  A summary of the tentatively agreed adjustments to the taxable estate is set forth below:

Tentatively Agreed Adjustments to Taxable Estate

Taxable estate per estate tax return          $527,720.79

Tentatively agreed adjustments to taxable estate, summarized by schedules of the return:

| | |
|---|---:|
| Schedule A | 28,000.00 |
| Schedule B | 1,252,085.61 |
| Schedule C | 3,174.62 |
| Schedule F | 18,318.26 |
| Schedule G | 127,230.75 |
| Schedule J | 31,515.02 |
| Schedule K | 243.08 |

Taxable estate as tentatively agreed     $1,988,288.13

The individual items comprising these adjustments are set forth more fully in Exhibit A to this stipulation.

2.  The taxable estate as tentatively agreed has been computed without allowance for certain deductions claimed by the estate for items which cannot be finally determined at this time, as follows:

(A)  An administratrix's commission of $27,500 claimed by Mary Orlando is in dispute before the Orphans' Court of Philadelphia County, Administration No. 2259 of 1978; Of

this amount, $13,626.51 has been deducted by the estate for income tax purposes on Form 1041, and the balance of $13,873.49 is claimed for estate tax purposes.

(B)  Attorney's fees paid to John T. Lynch, Jr., in the total amount of $495,700.02, and investigative fees paid to Edward J. Reardon in the total amount of $220,000, are currently in dispute and are the subject of litigation before the Orphans' Court of Philadelphia County:  Estate of Philip Meriano, No. 2259 of 1978, Petition of Anita Panepinto for Decree Directing the Deposit into Court of Certain Amounts paid from the Estate.  The amount of such fees which are finally paid and are not claimed on Form 1041, are claimed as deductions for estate tax purposes.

(C)  Attorney's fees have been charged by Dilworth, Paxson, Kalish & Kauffman in the aggregate amount of $231,347.50 for services rendered to Anita Panepinto, Administratrix c.t.a., through September 30, 1984, and additional such fees will be charged for services rendered thereafter.  All such fees will be stated in the account of Anita Panepinto which will be filed with the Orphans' Court of Philadelphia, and the Administratrix will request that the Court approve the amount of such fees.  Such fees will not include any amount for services rendered to Anita Panepinto and Elaine Hernadi in connection with any Orphans' Court proceeding involving the probate of the will and codicil of Philip Meriano or the appeal from that probate.  The amount of such fees which is finally paid and approved by the Court and is not claimed on Form 1041 is claimed as a deduction for estate tax purposes.

(D)  The amount of interest due on the Federal Estate Tax deficiency is dependent on the amount of such deficiency and the time of payment, neither of which is known at this time.  The amount of such interest which is

not claimed on Form 1041 is claimed as a deduction for estate tax purposes.

(E)  The Estate of Marie Meriano (decedent's wife) has a claim against the decedent in the amount of $12,021, as a debt owed by decedent to that estate, but payment of such amount has not yet been made.  The amount of such claim which is finally paid is claimed as a deduction for estate tax purposes.

3.  The taxable estate as tentatively agreed may be decreased as follows:

(A)  By an amount, not exceeding $13,873.49, equal to any allowance of an Administratrix's commission of Mary Orlando in excess of $13,626.51, determined either under a final decree of the Philadelphia Orphans' Court, Administration No. 2259 of 1978, and any appeal therefrom, or by an agreement between Mary Orlando and the estate.

(B)  By an amount, not exceeding $488,200.02, equal to any attorney's fees which are paid to John T. Lynch, Jr., and are either allowed by a final decision of the Philadelphia Orphans' Court, Administration No. 2259 of 1978, or are agreed upon between Lynch and the estate, less the amount, if any, which has been claimed on Form 1041.

(C)  By an amount not exceeding $220,000, equal to any investigative fees which are paid to Edward J. Reardon and are either allowed by a final decision of the Philadelphia Orphans' Court, Administration No. 2259 of 1978, or are agreed upon between Reardon and the estate, less the amount, if any, which has been claimed on Form 1041.

(D)  By the amount of any attorneys' fees which are paid to Dilworth, Paxson, Kalish & Kaffman for services rendered to Anita Panepinto, Administratrix c.t.a. of the estate, limited however to the amount of such fees allowed by a final decision of the Philadelphia Orphans' Court, Administration No. 2259 of 1978, and any appeal therefrom

and limited to the extent such fee has not been claimed on Form 1041.

(E)  By the amount of any interest paid by the estate on the Federal Estate Tax deficiency and not claimed on Form 1041.

(F)  By an amount, not exceeding $12,021, equal to any payment by the estate to the estate of Marie Meriano in respect to the claim by that estate against the decedent.

4.  None of the items described in item (3) above shall be allowed as a deduction for estate tax purposes to the extent that the estate or any other party elects to deduct such items for income tax purposes.

5.  It is also hereby stipulated that the addition to tax provided by Section 6653(b) of the Internal Revenue Code shall be computed as an amount equal to 18.75% of the underpayment of tax, and not 50%.

6.  It is hereby stipulated that the Pennsylvania inheritance tax paid by the estate is $83,290.51.

On September 16, 1985, the Court ordered that the case be stricken from the trial calendar in Philadelphia on September 30, 1985.  In its order, the Court stated:

On September 3, 1985, the parties filed their stipulation of disposition of issues in this case.  As indicated in that stipulation the final decision cannot be entered in the case until final resolution of certain matters now pending before the Court of Common Pleas of Philadelphia County, Pennsylvania, Orphans' Court Division, Administration No. 2259 of 1978, Estate of Philip Meriano.

Subsequent to the Court's order of September 16, 1985, petitioner's counsel, Latourette, filed eight status reports with the Court[8] informing the Court that the case had been settled and

_____

[8]  The dates on which the status reports were filed are: Nov. 28, 1986; Apr. 13, 1987; Oct. 1, 1987; Feb. 10, 1988; Sept.

that a decision would be submitted when the litigation in the Orphans' Court involving Lynch and Reardon was concluded.

On March 19, 1990, Latourette filed a status report with the Court in which he informed the Court:

> As requested in the Order of the Honorable Arthur L. Nims, III, dated September 7, 1990, we are responding with the current status of the above matter. On August 1, 1989, the Philadelphia Orphans' Court en banc ruled that John T. Lynch, Jr. was required to refund to the Estate of Philip Meriano $195,525.99 plus interest to August 1, 1989 of $100,606.03 and Edward J. Reardon, Jr. was required to refund to the Estate of Philip Meriano $78,983.10 plus interest of $40,638.79. John T. Lynch has appealed the decision but we have reached a settlement with Edward J. Reardon, Jr. Accordingly, we are not as yet in a position to finalize the Federal estate tax settlement. * * *

On February 12, 1990, Ridgely Abbe Scott (Scott) entered his appearance as counsel for the estate. Scott is the husband of Panepinto. He was in February 1990, and is now, Associate Professor of Law at Widener University School of Law where he teaches Corporate Tax I, Federal Income Tax, and Taxation of Compensation. He received his LL.M. in taxation in 1978 from New York University School of Law. He had a full schedule of courses to teach in the fall and spring semesters in each year beginning with the spring term of 1990. In addition, he taught summer school classes in 1990 and 1991.

When he filed his appearance in this case, he was not associated with any law firm.

---

28, 1988; Dec. 27, 1988; Mar. 2, 1989; and Sept. 1, 1989.

On June 25, 1990, Scott filed a status report with the Court which mirrored the status report filed by Latourette on March 19, 1990.

On August 6, 1990, Latourette withdrew himself and the Dilworth firm as counsel for the estate.

On October 31, 1990, James S. Tupitza (Tupitza) entered his appearance as counsel for the estate.

In a status report filed with the Court on March 9, 1992, counsel for respondent informed the Court, inter alia:

> 4.  Petitioner now wishes to abandon the claims she is defending (sic) in state court litigation and be allowed a deduction for the entire amounts paid on the theory it is unlikely the estate will ever collect the monies ordered to be repaid to the estate.

On November 26, 1993, Tupitza and counsel for respondent filed with the Court a Second Stipulation of Disposition of Issues (the Second Stipulation) which provided:

### SECOND STIPULATION OF DISPOSITION OF ISSUES

> In order to resolve the issues before this Court in the above-captioned case, the parties agree to stipulate the tentative settlement of all issues raised in the notice of deficiency upon which this case is based, and all issues raised in the Petition, Answer, and Reply filed in this case, excepting, however, two issues concerning the amounts, if any, of deductions allowable for property taken from estate assets by John T. Lynch, Jr. and Edward J. Reardon, respectively.  Those issues are not settled because the parties do not agree on the legal characterization of the circumstances of such taking.

> The parties agree as follows:

1.  Previously Agreed Adjustments to the
Taxable Estate

In a Stipulation of Disposition of Issues executed on behalf of the parties and filed with this Court in 1985, the parties agreed to a taxable estate tentatively determined as follows:

| | |
|---|---|
| Taxable estate per estate tax return | $527,720.79 |

Tentatively agreed adjustments to the taxable estate, as summarized by schedules of the return:

| | | |
|---|---|---|
| Schedule | A | 28,000.00 |
| Schedule | B | 1,252,085.61 |
| Schedule | C | 3,174.62 |
| Schedule | F | 18,318.26 |
| Schedule | G | 127,230.75 |
| Schedule | J | 31,515.02 |
| Schedule | K | 243.08 |

| | |
|---|---|
| Taxable estate as tentatively agreed in 1985 | $1,988,288.13 |

2.  Additional Adjustments Agreed to in Present
Stipulation Of Disposition of Issues

The parties tentatively agree on the following additional adjustments to the taxable estate as previously agreed in 1985:

| | |
|---|---|
| Taxable estate as tentatively agreed in 1985 | $1,988,288.13 |

Additional adjustments to the taxable estate, as summarized by schedules of the return:

| | | |
|---|---|---|
| Schedule | J | ( 647,652.44) |
| Schedule | K | ( 12,021.00) |

Taxable estate as tentatively agreed
in this stipulation
                    $1,328,614.69

3.  Additional Decrease Which Depends on
Computation of Interest

The parties agree that the taxable estate as tentatively agreed in the amount of $1,328,614.69 may

be decreased by the amount of any interest paid on the Federal Estate Tax deficiency and not claimed on Form 1041.

4. Additional Decrease Which Depends on Decision of the Court

The parties agree that the taxable estate as tentatively agreed in the amount of $1,328,614.69 has been determined without allowance for the following item which is claimed as a deduction by the petitioner and has not been allowed by the Commissioner:

A deduction in the amount of $274,505.09 for the value of bonds, interest on bonds, or the proceeds of bonds, owned by the estate and received from the estate by John T. Lynch, Jr.

The Petitioner claims that such amount is deductible as a theft loss, under Code section 2054.

The Respondent argues that this item is deductible, if at all, only as an expense of administration, under Code section 2053(a)(2), and as such is limited to the amount allowable under the laws of Pennsylvania, where the estate is being administered, and the amount so allowed has already been considered in the tentatively agreed Schedule J adjustments noted earlier.

5. Additional Decrease Which Depends on Substantiation By the Petitioner

The parties agree that the taxable estate as tentatively agreed in the amount of $1,328,614.69 has been determined without allowance for the following item which is claimed as a deduction by the petitioner and has not been allowed by the Commissioner:

A deduction in the amount of $43,516.25 for fees billed by the law firm of Tupitza and Marinelli.

The Petitioner claims that such amount is deductible as attorney fees, as provided in section 20.2053-3(c) of the Estate Tax Regulations.

The Respondent argues that such amount would be deductible if the Petitioner furnishes substantiation that the amount claimed has been paid or will be paid, and has not been claimed on Form 1041. Such substantiation may be provided by the use of Form 4421.

### 6. Addition to Tax Under Code Section 6653(b)

In the Stipulation of Disposition of Issues filed with this Court in 1985, the parties agreed, and continue to agree, that the addition to tax provided by Section 6653(b) of the Internal Revenue Code shall be computed as an amount equal to 18.75% of the underpayment of tax.

The taxable estate as tentatively agreed in The First Stipulation was $1,988,288.12. The taxable estate as tentatively agreed in The Second Stipulation is $1,328,614.69. The decrease results from (1) an increase in Schedule J of $647,652.44 which approximates the sum of $401,256.10, the amount of fees allowed to Lynch and Reardon by the Orphans' Court, and the Dilworth firm's legal fees of $231,34.50 referred to in paragraph 2(C) of The First Stipulation, and (2) an increase in Schedule K of $12,021, which is the amount referred to in paragraph 2(E) in The First Stipulation.

This case was tried for 11-1/2 hours from December 5, 1994, through December 7, 1994.

OPINION

### Issue 1. Claimed Theft Loss Deduction

Petitioner contends that the estate is entitled to a theft loss deduction for the amount of "excess fees" paid from the estate's assets to Lynch and Reardon. To the contrary, respondent contends that petitioner failed to prove that Lynch and Reardon stole anything from the estate and has disallowed the claimed theft loss deduction.

Petitioner bears the burden of proving that respondent's determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). The general rule is that deductions are strictly a matter of legislative grace, and a taxpayer has the burden of establishing entitlement to any deduction claimed on the return. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Estate of Damon v. Commissioner, 49 T.C. 108, 118 (1967).

The value of decedent's taxable estate equals the value of his or her gross estate less certain deductions. Sec. 2051. Section 2054 allows a deduction from the value of the gross estate for losses incurred during the settlement of the estate arising from fires, storms, shipwrecks, or other casualties, or from theft, when such losses are not compensated for by insurance or otherwise.

In Estate of Shlensky v. Commissioner, T.C. Memo. 1977-148, this Court stated, regarding section 2054:

> While neither this section nor the applicable
> regulations define the term "theft," the section's
> language closely parallels section 165(c)(3), and under

that section the issue as to whether a loss arose from theft is to be determined under the applicable State law. Weingarten v. Commissioner, 38 T.C. 75, 78 (1962). The leading income tax case of Edwards v. Bromberg, 232 F.2d 107, 110-111 (5th Cir. 1956), broadly defines "theft" as used in section 165(c)(3) as follows:

> * * * the word "theft" is not like "larceny," a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile * * * [I]t has been long and well established that whether a loss from theft occurs within the purview of Section 23(e)(3) [the predecessor to section 165(c)(3)] of the Internal Revenue Code of 1939 and the corresponding provisions of prior acts, depends upon the law of the jurisdiction where it was sustained and that the exact nature of the crime, whether larceny or embezzlement, of obtaining money under false pretenses, swindling or other wrongful deprivations of the property of another, is of little importance so long as it amounts to theft. [Fn. ref. omitted.]

Both parties agree that "theft" is a criminal appropriation of another's property. The elements of "theft" under Pennsylvania law are embodied in the Crimes Code, Act. No. 334, section 1.6, 1972 Pa. Laws 1482, at 1612-1613. Under the Crimes Code, effective June 6, 1973, the intent required is a "thieving state of mind" (citing 18 Pa. Cons. Stat. Ann., sec. 302 (1973)); Commonwealth v. Kuykendall, 318 Pa. Super. 429, 465 A.2d 29 (1983); Commonwealth v. Shaffer, 279 Pa. Super. 18, 420 A.2d 722 (1980).

Respondent contends that to prove "theft" under Pennsylvania law "the mind of a thief" is relevant and that it must be shown that there was a specific criminal intent to permanently deprive the owner of his or her property.  The existence vel non of criminal intent in the circumstances of a particular taking is a question of fact, and one which is peculiarly within the competence of this Court to decide.  Farcasanu v. Commissioner, 436 F.2d 146, 149 (D.C. Cir. 1970), affg. per curiam 50 T.C. 881 (1968).

Both parties quote Jones v. Commissioner, 24 T.C. 525, 527 (1955) (quoting Allen v. Commissioner, 16 T.C. 163, 166 (1951)) for guidance as to the burden of proof in a theft case:

> Petitioner has the burden of proof.  This includes presentation of proof which, absent positive proof, reasonably leads us to conclude that the article was stolen. If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail. If the evidence is in equipoise preponderating neither to the one nor the other conclusion, petitioner has not carried her burden.

Petitioner attempts to transmute an obvious fee dispute with respect to Lynch and Reardon into a criminal activity, i.e., theft.  Thus, under the rationale of the Allen case, the threshold question is whether the reasonable inferences from the evidence point to a fee dispute or a theft.  If it was a fee dispute, then we need not jump through hoops raised by petitioner's assertions that Lynch and Reardon committed a theft

under various sections of the Pennsylvania Criminal Code, namely, 18 Pa. Cons. Stat. Ann. (1983), sec. 3927 (Theft by failure to make required disposition of funds received); sec. 4113 (Misapplication of entrusted property and property of government and financial institutions); sec. 3921 (Theft by unlawful taking or disposition); sec. 3922 (Theft by deception); or sec. 3925 (Receiving stolen property).

In our judgment the overwhelming evidence contained in this record shows that this was nothing more than a fee dispute. It simply does not support petitioner's belated and tenuous assertions of a theft. Lynch did not steal any money from the estate. He was paid for his work in recovering the previously stolen bonds. This was done pursuant to four separate agreements with the estate regarding payment of his fees. The first is a contract for the work to be performed that Lynch negotiated with Mary Orlando, then administratrix of the estate. The second is the Hold Harmless agreement signed by Lynch. Certainly he would not have signed it if he was trying to hide the full payment of his fee under the contract. The third is the Trading Authorization given to Lynch by Mary Orlando so that he could dispose of assets necessary to pay his fee. The fourth is an agreement signed by Mary Orlando to carry out the terms of the contract to pay Lynch and Reardon in specified amounts for the work they had done. These documents clearly show the intent of Lynch and Reardon. To be sure, if the Orphans' Court had

enforced the precise terms of the contract between Lynch and the estate, rather than invoking its equity powers by modifying and reforming the contract, Lynch would not have been ordered to pay back any funds to the estate. He was paid the amount provided for in the contract.

All in all, the reasonable inferences to be drawn from these facts and from the record as a whole are that this was merely a fee dispute between Lynch and the present administratrix of the estate. The facts establish that petitioner never asserted a theft by Lynch in the Orphans' Court proceedings or in the appeals; that no criminal action for theft has ever been brought against Lynch by the district attorney; that no charges of unprofessional conduct have been filed against Lynch; and that the administratrix has filed no claim with the Pennsylvania Lawyers Fund for Client Security charging that Lynch stole or otherwise defalcated the estate's funds. We think it is important to point out that Arthur Littleton, the general counsel for the Client Security Fund, testified that in circumstances similar to this case a claim would have been considered a fee dispute for which the Client Security Fund would not have paid.

On August 7, 1978, Mary Orlando, then administratrix of the estate, entered into an agreement with Lynch to locate securities stolen from Philip Meriano on or about July 6, 1977. The agreement provided that Lynch would receive 33-1/3 percent of the

face value of any securities recovered if they were recovered prior to suit.  Otherwise Lynch was to receive 40 percent of the face value of any securities recovered after filing suit.

Lynch then entered into an agreement whereby Reardon agreed to assist Lynch in the investigation to recover the stolen securities.  Reardon was to be paid 15 percent of the face amount of any securities recovered.

Lynch's and Reardon's investigation was successful, and the estate recovered stolen securities in the face amount of $1,623,000.  As Judge Shoyer, the auditing judge of the Orphans' Court, noted in his Adjudication of September 21, 1988:

> In endeavoring to arrive at a reasonable and fair fee, the auditing judge is most conscious of the fact that had it not been for Reardon and Lynch, there would be nothing here for the parties to fight about.

Judge Shoyer noted that:

> Counsel for Panepinto claim that it is "clear that any impropriety by Reardon may be subject to the sanctions of the court, and compensation should be denied."  There is, however, no assertion of any so called "impropriety" by Reardon.

At the trial of this case, petitioner called Reardon as a witness to inquire whether he had paid to the estate the amount he was surcharged by the Orphans' Court.  Reardon replied that he had entered into a settlement agreement with the estate.

BY MR. TUPITZA:

> Q  You entered into -- what type of settlement agreement did you enter into with the estate?

- 39 -

A   A negotiated amount less than the charged amount.

Q   And what was the amount of that agreement?

A   I don't have a copy of it.

Q   Is it your testimony you received a release from the estate?

A   Yes.

        *    *    *    *    *    *    *

MR. TUPITZA: I'm somewhat surprised, Your Honor.

THE COURT: I can see that.

MR. TUPITZA: I have never heard this before nor ever seen any evidence of this in any of the documentation.[9]

        *    *    *    *    *    *    *

BY MR. TUPITZA:

Q   Did you make whatever payment was required to be made pursuant to the agreement that you allege you had with the estate?

A   I made an initial payment of $25,000.

Q   And did you pay the balance?

A   I did not.  I did not have any more money.

Q   So you did not fully comply with the terms of whatever settlement you had reached with the estate?

A   That's correct, and I never got called by anybody on the estate, or never received a letter from anybody.  I believe my attorney communicated with the

---

[9]     In a status report filed with the Court on March 19, 1990, Latourette informed the Court that the estate had reached a settlement with Reardon.

Dillworth (sic) firm that I did not have any more liquid assets and I never heard anything on that matter again in eight years, nine years.

After the Orphans' Court, sitting en banc, issued its opinion and order on August 1, 1989, all parties appealed the order to the Superior Court, which affirmed the order on June 13, 1990. Lynch then filed a petition for the allowance of an appeal to the Pennsylvania Supreme Court, which was denied on January 15, 1991. As to Lynch, therefore, the Orphans' Court litigation was concluded on January 15, 1991.

In the meantime, on August 29, 1989, Lynch had filed a petition in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania, pursuant to Chapter 13 of Title 11, United States Code. In his petition Lynch, acknowledging his debt, listed the Estate of Philip Meriano as a judgment creditor in the amount of $225,000.

On August 22, 1990, Lynch's bankruptcy petition was dismissed by the bankruptcy court because the bankruptcy estate failed to file required schedules.

No further steps were taken by the estate to collect the judgment debt from Lynch. In making this finding, we are not unmindful of Tupitza's testimony at trial that:

We spent sometime trying to do some collection efforts on Lynch and Reardon and at one point, after a discussion with Ms. Panepinto, we took those time slips and purged them and did not bill for that time.

For various reasons stated, <u>infra</u>, we do not credit Tupitza's testimony.  In this instance we think petitioner failed to pursue any collection activities against Lynch and Reardon to recover the amounts that the Orphans' Court ordered them to refund to the estate, after the estate entered into a settlement agreement with Reardon sometime in late 1989 or early 1990, and after Lynch's petition in bankruptcy was dismissed on August 22, 1990.

In eight status reports filed with this Court from November 28, 1986, through September 1, 1989, the estate informed this Court that this case had been settled and that a final decision would be submitted when the fee dispute involving Lynch and Reardon was concluded.  As previously noted, the fee dispute involving Lynch and Reardon was disposed of on January 15, 1991, when the Pennsylvania Supreme Court denied Lynch's petition for the allowance of an appeal.

In a status report filed with the Court on March 9, 1992, respondent informed the Court:

> 4.  Petitioner now wishes to abandon the claims which she is defending (sic) in state court litigation and be allowed a deduction for the entire amounts paid on the theory that it is unlikely the estate will ever collect the monies ordered to be repaid to the estate.

> \*   \*   \*   \*   \*   \*   \*

> 9.  This report has been discussed with James Tupitza, Esquire, counsel for petitioners (sic).

On March 25, 1993, the Court set this case for an oral status report at the Motions Session of the Court in Washington, D.C., on June 23, 1993.  At that hearing on June 23, 1993, Tupitza informed the Court:

> The bonds that we are talking about are bonds that, in our position, were stolen twice.  They were stolen first by the housekeeper and taken out to California, and then, when they were recovered, the attorney and his accountant investigator stole them a second time.  We litigated with that attorney all the way to the Pennsylvania Supreme Court.  He has been disbarred for not returning this money.[10]  He has disappeared.[11]  I have no idea where the man is.  He filed for bankruptcy at one point and sought to discharge this in bankruptcy, and then that bankruptcy was dismissed.
>
> Our position, at some point, is going to be that this is a theft loss to the estate, and that is probably going to be the narrow issue that we are going to be left with out of hundreds of other issues that we started with.

There is no credible evidence in this record to justify petitioner's assertion of theft by Lynch and/or Reardon. We regard the claim as made out of whole cloth.  Whether from bias toward Lynch or from determined obfuscation to reduce the estate's tax liability, petitioner had tried, albeit unsuccessfully, to make its evidence fit a Procrustean bed in its effort to establish a theft loss.  To support its allegation that

---

[10]    Lynch has never been disbarred from the practice of law by any jurisdiction.

[11]    Lynch never "disappeared" or made himself unavailable to petitioner.  In fact, he was subpoenaed by petitioner and testified at trial.

Lynch stole some of the estate's funds, petitioner relies mainly on fragmentary and confusing evidence that Lynch acted without lawful authority and converted to his own use assets and funds of the estate. This evidence is insufficient, and we reject it. Moreover, petitioner abandoned all efforts to collect refunds due the estate from Lynch and Reardon.

Lynch was an attorney hired by the estate for the particular task of locating and recovering securities stolen from Philip. He enlisted Reardon to assist him in accomplishing the task assigned, and they were successful in doing so.

Petitioner principally relies upon the proceedings before the Orphans' Court to support its allegation of theft. We have perused the entire record of the Orphans' Court litigation to find any mention of "theft". There is none. Terms such as "overreaching", "ethical considerations", "failure to keep adequate records", and "noncooperation" are all indicia of shortcomings on the part of Lynch, but they fall far short of establishing the "thieving state of mind" required to establish the crime of "theft" under Pennsylvania law.

Petitioner's attempt to convert a fee dispute into a criminal act of theft in order to reduce its taxable estate is unpersuasive. Therefore, we hold that petitioner's claimed theft loss deduction must be denied.

Issue 2. Attorney's Fees

Section 2053(a)(2) provides for the deduction from the value of the gross estate of such amounts for administrative expenses "as are allowable by the laws of the jurisdiction * * * under which the estate is being administered".  Administrative fees include attorney's fees.  The amount claimed must be actually and necessarily incurred in the administration of the estate and must be reasonable.  Sec. 20.2053-3, Estate Tax Regs.

Under Pennsylvania law, the Orphans' Court is the Court that reviews the validity of and the reasonableness of administrative fees.  When the fees of counsel are brought before the Orphans Court for review, it is a function of the court to decide what is a reasonable and just compensation under all the circumstances. Crawford's Estate, 307 Pa. 102, 111, 160 A. 585, 588 (1931). Factors to be considered are the size of the estate, the novelty and difficulty of the questions involved, the extent of counsel's labor on the case and the time the labor required, the responsibility assumed by counsel and his professional standing. Warden Estate, 348 Pa. 224, 225, 35 A.2d 297, 298 (1944).

Respondent contends that the attorney's fees that the estate seeks to deduct for payments made to the Tupitza law firm are unreasonable.

The Orphans' Court has not been asked to pass upon the reasonableness of the Tupitza law firm's attorney's fees, and it falls upon us to make the determination.

In order to better understand our disposition of this matter, a brief review of the administration of this estate may be helpful.

When Panepinto was appointed administratrix of the estate, the Orphans' Court ordered the prior administratrix, Mary Orlando, to submit an accounting of the estate to the court. The ordered accounting was not forthcoming, and Boote, the attorney for INA, prepared and filed with the court an accounting. Boote testified at trial that when Panepinto was appointed administratrix of the estate, on September 1, 1982:

> Ms. Panepinto wanted the money distributed to Mrs. Orlando, the money paid out in fees, she wanted everything. She wanted it all back in the estate and she wanted to be paid as much as she could be paid.

Panepinto retained the services of the Dilworth law firm as the legal representative of the estate. Latourette was one of the attorneys in the Dilworth firm to whom the estate matter was assigned. From 1982 through August 6, 1990, the Dilworth firm represented the estate.

On September 3, 1985, Latourette and counsel for respondent filed with the Court a Stipulation of Disposition of Issues which resolved all issues pending between the estate and the Internal Revenue Service, except for:

(1) An administratrix's commission of $13,873.49 claimed by Mary Orlando that was being disputed before the Orphans' Court.

(2)  The amount of fees paid to Lynch and Reardon that were in dispute before the Orphans' Court.

(3)  Attorney's fees payable to the Dilworth firm by the estate in the amount of $231,347.50, for services rendered through September 30, 1984, and additional fees to be charged for services rendered thereafter.

(4)  The amount of interest due on the Federal estate tax deficiency.[12]

(5)  A claim by the Estate of Marie Meriano against Philip Meriano in the amount of $12,021.

At trial, Panepinto testified that the Dilworth firm had presented to the estate a bill for legal services in an amount of approximately $400,000.  However, we are informed by the Second Stipulation filed November 26, 1993, that the estate paid the Dilworth firm only $231,347.50 for legal services rendered until September 30, 1984.  There is no evidence in the record to explain why the Dilworth firm was not paid legal fees in a total amount of approximately $400,000.

Respondent has agreed to allow the estate a deduction for legal fees paid to the Dilworth firm in an amount of approximately $231,000.

It appears from the record that the issues remaining for decision as set forth in the First Stipulation filed September 3,

---

[12]  This is a matter of law.

1985, were all resolved, save one, in the Second Stipulation filed November 26, 1993. Those were simple, uncomplicated issues that could not have required a great amount of legal services to resolve them.

The only issue that remained for decision on November 26, 1993, was the claimed theft loss deduction first raised by Tupitza in 1992.

In the Second Stipulation filed November 26, 1993, the parties also informed the Court:

### 5. Additional Decrease Which Depends on Substantiation By the Petitioner

The parties agree that the taxable estate as tentatively agreed in the amount of $1,328,614.69 has been determined without allowance for the following item which is claimed as a deduction by the petitioner and has not been allowed by the Commissioner:

A deduction in the amount of $43,516.25 for fees billed by the law firm of Tupitza and Marinelli.

The Petitioner claims that such amount is deductible as attorney fees, as provided in section 20.2053-3(c) of the Estate Tax Regulations.

The Respondent argues that such amount would be deductible if the Petitioner furnishes substantiation that the amount claimed has been paid or will be paid, and has not been claimed on Form 1041. Such substantiation may be provided by the use of Form 4421.

From November 1993 to December 1994, the Tupitza firm billed the estate approximately $149,500 (Total Bill - $193,004.43[13] -

---

[13]    Exh. 47.

43,516.25) for legal services to prepare and try one issue that took 11 1/2 hours to try.

Panepinto is a lawyer. Our review of the record in this case convinces us that she kept herself fully apprised of the fees for legal services incurred by the estate during the time the estate was represented by the Dilworth law firm.

She testified at the trial of this case as to the reasonableness of the legal fees charged to the estate by the Tupitza law firm and, except for the certitude that the fees charged were "very reasonable," she was a particularly unknowing witness. On cross-examination, the following colloquy took place between counsel for respondent and Panepinto:

Q  Have you discussed the issue of fees with your attorney in preparation for today -- with Mr. Tupitza?

A  He gave me a copy of the fees.

Q  Did you discuss this bill or any other subject with respect to your testimony today?

A  Yes.

Q  When did you talk to him about it?

A  I guess this morning.

Q  Do you know the amount of the deduction at issue in this case due to the actions of Lynch and Reardon?

A  Yes.

Q  How much is it?

A  I think it's approximately $250,000.

Q   Do you know how much difference in estate tax
that deduction will make?

A   Not offhand.

Q   Do you know what the estate tax bracket is now
after the stipulations have been filed with respect to
this issue?

A   No.  I would have to check with him.

          *    *    *    *    *    *    *

Q   Did you have any understanding with the Tupitza
firm regarding the amount of fees that you would pay
with respect to this issue, the theft loss issue?

A   It was pretty much a situation where I was
trying to resolve it with the IRS and I was paying them
an hourly fee until it could be resolved.  That's
basically the problem.

          *    *    *    *    *    *    *

Q   Did you ask them for an estimate of the
remaining fees that would be charged after the second
stipulation of disposition of issues was filed?

A   No.

Q   Is there a contingency fee agreement with
respect to the theft issue?

A   No.

Q   Is there a written contract for services?

A   Between myself and Mr. Tupitza?

Q   Yes.

A   It's an hourly fee he's being paid.

Q   What was your understanding as to how much the
hourly fee would be that was to be paid to Mr. Tupitza?

A   I'm not sure.  I think it's --

Q  Do you know whether that's the amount that you were charged on the bill?

     *    *    *    *    *    *    *

The question is do you know whether the amount that you agreed upon with Mr. Tupitza is the amount that's reflected on the bill.

A  I would have to review my documents to see what I had agreed.  I have it written down some place and I would have to look it over.  I did look it over after I looked at this bill and I realized that (sic) it was, but I don't remember exactly what it was.  I <u>think it was approximately $100</u> but I'm not sure what the hourly fee is.  [Emphasis added.]

Q  Did you have an understanding with Mr. Scott as to the hourly fee that would be paid him for work done on the theft loss issue in this case?

A  Well, I had employed Mr. Tupitza and he employed Mr. Scott.

     *    *    *    *    *    *    *

Q  Do you know how much Mr. Scott's part of this bill is for the litigation of the theft loss issue?

A  I would have to figure it out.  I'm not sure. I just received one bill.

Q  Do you know if there is an agreement between Mr. Scott and Mr. Tupitza -- I'm sorry.  Strike that.

Did you agree with Mr. Tupitza as to how much Mr. Scott would be paid, or did Mr. Tupitza set that fee?

A.  I spoke with Mr. Tupitza originally and he told me what he was going to charge and then he employed Mr. Scott and they dealt with it.  I didn't talk to Mr. Scott about this.

As a witness, Panepinto's forte seems to have been

tergiversation, and we do not credit her testimony.

The next witness called by petitioner to testify as to the reasonableness of the fees charged to the estate by the Tupitza law firm was Tupitza.  The direct examination of Tupitza was conducted by Scott.[14]

Tupitza first explained that his firm had a policy of always discussing fees in the first contact with the client in order to reach an agreement on fees.  He testified that the Supreme Court (Pennsylvania) "had dictated that we disclose what the fees are up front."  In this case the firm agreed to represent the estate on a fee per hour basis.  He was then asked whether the agreement was in writing.  He responded:

> We generally have a fee letter that we send to the client and ask him to sign it and send it back.  I don't have it with me here, but I have no reason to believe that I would have deviated from our normal practice and not had a fee letter with her.

Tupitza then testified that he agreed with the estate to bill his services at $225 per hour and Scott's services at $150 per hour.

We are left with Tupitza's uncorroborated, self-serving testimony that this Court need not accept.  Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), affg. T.C. Memo. 1969-159; Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992);

---

[14]    The total bill submitted to the estate by the Tupitza firm approximates $197,000.  Of that amount $67,437.50 was billed for Tupitza's time; $115,535 was billed for Scott's time.

Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Sacks v. Commissioner, T.C. Memo. 1994-217.

At trial, Tupitza testified that all of his firm's bills, for probably 10 years, have been done by computer.  He was asked by respondent how frequently entries were put into the computer. Tupitza responded:

> A  Well, I used to have a computer at my desk and I would often put my time in each day as I did things and then somebody else in the office came along and thought mine was faster, so I don't have a computer there now.

> I usually gave the time to Felicia on a daily basis, or we meet on a daily basis -- Felicia being my secretary.  We confirm what our notes are for what was done on that day and then she enters it in.  Many of the things she enters in contemporaneously or simultaneously with my doing the work.

> Q  Did Mrs. Scott ever ask you to cut your bill in this case?

> A  Yes, she did.

> Q  When?

> A  At a point in time when I reported to her that I didn't think we were going to be able to get any money out of Lynch and Reardon and she didn't want to pay for any time that related to that.  We hadn't billed for it as yet, but she asked me not to bill her for it.

> Q  That would be billable time with respect to pursuing collection efforts?

> A  That's correct.

> Q  Other than that, there would have been no reason for you to cut your bill in this case, correct?

> A  Not that I can think of at the moment, no.

At the commencement of the trial of this case, the parties filed a Joint Stipulation of Facts.  Attached to the joint stipulations was, inter alia, Joint Exhibit 17-Q (17-Q).  Tupitza identified 17-Q as a computerized printout of a bill for legal services performed by his law firm for Panepinto as administratrix of the Meriano Estate, covering the period August 20, 1990, through December 9, 1994.  The total bill was for $197,008.40 and was based, in part, on an hourly fee of $225 attributable to the legal services performed by Tupitza.  It also showed:

| Date | Payment |
|------|---------|
| 8/13/93 | $500.00 |
| 12/10/93 | 150.00 |
| 12/15/93 | 450.00 |
| 4/4/94 | 5,000.00 |
| 10/10/94 | 2,000.00 |
| Total Payments | 8,100.00 |
| Balance Due | 188,908.40 |

A considerable portion of 17-Q was marked through and the Court instructed petitioner to submit a "clean" copy of the bill presented to the estate by the Tupitza law firm.

On December 7, 1994, the third and final day of trial, petitioner introduced into evidence Exhibit 47, a "clean" copy of 17-Q.  Exhibit 47 did not contain the first three pages of 17-Q.  Exhibit 47 showed some costs in addition to those shown on 17-Q

and also showed a payment allegedly made the night before; i.e., on December 6, 1994, in the amount of $188,000.[15]

Respondent called as a witness Howard Switkay (Switkay), who is employed as an Appeals officer by the Internal Revenue Service. He was assigned as an Appeals officer to handle the disposition of this case. He was called as a witness for the sole purpose of identifying Exhibit T, which respondent introduced into evidence.

Exhibit T is a computerized printout of a bill for legal services performed by the Tupitza law firm for Panepinto as executrix of the Meriano Estate, covering the period from June 6, 1993, through November 8, 1993, and is dated November 8, 1993. It was submitted to Switkay by Tupitza during settlement negotiations, and it was understood between Switkay and Tupitza that it was documentation in support of charges for legal services that Tupitza was seeking to deduct on the estate tax return. Legal services performed by Tupitza for the estate were charged at the rate of $150 per hour on Exhibit T. After Switkay testified about Exhibit T, Tupitza put himself back on the stand and was questioned on redirect examination by Scott:

> Q  Mr. Tupitza, does the bill just entered into
> evidence by the Internal Revenue Service accurately
> reflect the charges which were submitted to the client?

---

[15]    No documentary evidence of the alleged $188,000 payment was introduced into evidence apart from the $188,000 credited to the account on Exh. 47.

A  This particular bill was actually never mailed to the client.  Mr. Switkay and I were going back and forth on some things and I had sent him this bill.

I had never actually looked at what the billing rate was on it.  Sometime in -- I think it was probably even this summer, we re-ran this same bill and when we ran the bill the time frames went considerably beyond this.  I think the last time slip on this one is November of '93.  They went into '94 and the '94 time slips had the 225 on them, so the discrepancy picked up between the two of the time rates, the 225 and 150 an hour.

We then went back in and adjusted the slips that had the wrong billable rate on them, and when we actually submitted a bill to the client we submitted it with the proper billable rate.

Q  So the document was a mere draft?

A  It was a draft for our discussions with the Internal Revenue Service.  At that point we were talking about a settlement of the entire issue.

This was a draft and it also had on it some notations about projected additional time and things of that nature.

We do not credit Tupitza's testimony.  Having observed him as a witness and after having thoroughly reviewed all the evidence, we are convinced that Tupitza agreed to charge the estate $150 per hour for his legal services, and we so find.

During the last day of trial, the Court briefly examined Exhibit 47 and noted that the Tupitza law firm had billed the estate $115,535 for legal services allegedly performed by Scott. When the parties informed the Court that they had no further evidence to submit at trial, the Court called Scott as a witness

pursuant to rule 614(a), Federal Rules of Evidence, without objection from either party.

Scott is the husband of Panepinto, the administratrix of the estate. He entered his appearance in this case in February 1990. At that time, and through the time of trial, he was an associate professor of law at Widener University.[16] He had a full schedule to teach in the fall and spring semesters of each year beginning with the spring term of 1990. In addition, he taught summer school classes in 1990 and 1991. He had 6 hours of classes a week in the spring and fall semesters during each year. He informed the Court that since he had been teaching his tax courses for so long he only had to spend 2 to 3 hours per week for class preparation in order to keep current with new developments in the tax area.

When he entered his appearance in this case in February 1990, Scott was not associated with any law firm. He associated himself with Tupitza in July or August 1990, in connection with this case. He testified that the estate is billed $150 an hour for his legal services and that he is paid at the rate of $150 per hour. Incredibly, the Tupitza law firm realized no income from the legal services performed by Scott, a "contract employee". (More hereinafter about Scott's billable hours.)

---

[16] Scott has an LL.M. in Tax from NYU and teaches Corporate Tax I, Federal Income Tax and Taxation of Compensation.

The Court then invited either party to examine Scott and Tupitza inquired of him:

>        TUPITZA  Are you in fact paid by the law firm of Tupitza and Marinelli?
>
>        (SCOTT)  Yes, I am.
>
>        TUPITZA  And do you in fact expect to get a 1099 for all that you're paid from the firm?
>
>        (SCOTT)  Yes, I do.  In fact, if I didn't get a 1099 I would complain to you.[17]

The following is a summary of Exhibit 47:

|                      | Hours  | Charges       |              |
|----------------------|--------|---------------|--------------|
| Scott                | 760.70 | $115,535.00   |              |
| Tupitza              | 302.10 | 67,437.50     |              |
|                      |        |               | $182,972.50  |
| Ericsson (Attorney)  | 16.20  | 2,025.00      |              |
| Paralegal            | 25.00  | 1,500.00      |              |
|                      |        |               | 3,525.00     |

Projected Trial Time:

|                    | Hours | Charges  |             |
|--------------------|-------|----------|-------------|
| Scott              | 10:00 | 1,500.00 |             |
| Tupitza            | 10:00 | 2,250.00 |             |
|                    |       |          | 3,750.00    |
| Additional charges |       |          | 2,756.93    |
|                    |       |          | $193,004.43 |

---

[17]     When Scott was questioning Tupitza on direct examination, Scott asked:  "What year did you first pay fees to Mr. Scott?  And Tupitza answered:  "I think the first fees I actually paid to Mr. Scott or remitted to Mr. Scott were probably in 1994."

We note that from the first billing date on Exhibit 17-Q, August 20, 1990, (Scott billed $2,187.50 for 12-1/2 hours to "Organize file for Tax Court") until December 6, 1994, when the estate, during trial, allegedly paid the Tupitza law firm $188,000, the estate had only paid the law firm a total of $8,100.

Scott's billings account for 60 percent of the total amount charged to the estate by the Tupitza law firm and the number of hours charged by him constitute 68 percent of the total hours billed by the law firm to the estate.

The following table is compiled from Exhibit 47 and is alleged to reflect the hours expended by Scott in rendering legal services to the estate:

| Date | Activity | Hours | Amount |
|------|----------|-------|--------|
| 8/7/93 (Sat.) | Research | 6 | $900 |
| 8/8/93 (Sun.) | Research | 10 | 1,500 |
| 8/9/93 | Research | 9 | 1,350 |
| 8/10/93 | Research | 9 | 1,350 |
| 8/14/93 (Sat.) | Research | 10 | 1,500 |
| 8/15/93 (Sun.) | Research | 9 | 1,350 |
| 11/20/93 (Sat.) | Research | 5 | 750 |
| 11/21/93 (Sun.) | Research | 6 | 900 |
| 11/22/93 | Research | 10 | 1,500 |
| 11/23/93 | Research | 9 | 1,350 |
| 11/24/93 | Research | 10 | 1,500 |
| 11/25/93 (Thanks-giving day) | Research | 11 | 1,650 |
| 11/26/93 | Research | 10 | 1,500 |
| 11/27/93 (Sat.) | Research | 6 | 900 |
| 11/28/93 (Sun.) | Research | 4 | 600 |
| 11/29/93 | Research | 9 | 1,350 |
| 11/30/93 | Research | 10 | 1,500 |
| 12/1/93 | Research | 2 | 300 |
| 12/2/93 | Research | 7 | 1,050 |
| 12/3/93 | Research | 10 | 1,500 |
| 12/4/93 (Sat.) | Research | 9 | 1,350 |
| 12/5/93 (Sun.) | Research | 9 | 1,350 |
| 12/6/93 | Research | 11 | 1,650 |
| 12/7/93 | Research | 8 | 1,200 |
| 12/10/93 | Research | 9 | 1,350 |
| 12/11/93 (Sat.) | Research | 10 | 1,500 |
| 12/12/93 (Sun.) | Research | 8 | 1,200 |
| 12/13/93 | Research | 7 | 1,050 |
| 12/15/93 | Research | 8 | 1,200 |
| 12/16/93 | Research | 10 | 1,500 |
| 1/29/94 (Sat.) | Research | 9 | 1,350 |
| 1/30/94 (Sun.) | Research | 8 | 1,200 |

| Date | Activity | Hours | Amount |
|------|----------|-------|--------|
| 1/31/94 | Research | 11 | 1,650 |
| 2/1/94 | Research | 10 | 1,500 |
| 2/2/94 | Research | 5 | 750 |
| 3/15/94 | Research | 9 | 1,350 |
| 3/21/94 | Research | 9 | 1,350 |
| 3/22/94 | Research | 7 | 1,050 |
| 3/31/94 | Research | 9 | 1,350 |
| 4/1/94 | Research | 4 | 600 |

| Date | Activity | Hours | Amount |
|------|----------|-------|--------|
| 9/7/94 | Locate Webb Estate[18] and 704 Issues; locate addresses, witnesses | 10 | 1,500 |
| 9/8/94 | Locate Webb Estate and 704 Research | 7 | 1,050 |
| 9/12/94 | Research/Trial Prep. | 8 | 1,200 |
| 9/13/94 | Research/Trial Prep. | 9 | 1,350 |
| 9/14/94 | Research/Trial Prep. | 10 | 1,500 |
| 9/15/94 | Research/Trial Prep. | 9 | 1,350 |
| 9/16/94 | Research/Trial Prep. | 8 | 1,200 |
| 9/17/94 (Sat.) | Research/Trial Prep. | 6 | 900 |
| 9/19/94 | Research/Trial Prep. | 10 | 1,500 |
| 11/1/94 | Prep. for Trial | 10 | 1,500 |
| 11/2/94 | Prep. for Trial | 8 | 1,200 |
| 11/4/94 | Prep. for Trial | 10 | 1,500 |
| 11/5/94 (Sat.) | Prep. for Trial | 8 | 1,200 |
| 11/7/94 | Prep. for Trial | 8 | 1,200 |
| 11/8/94 | Prep. for Trial | 5 | 750 |
| 11/10/94 | Prep. for Trial | 6 | 900 |
| 11/11/94 | Prep. for Trial | 11 | 1,650 |
| 11/12/94 (Sat.) | Prep. for Trial | 10 | 1,500 |
| 11/13/94 (Sun.) | Prep. for Trial | 10 | 1,500 |
| 11/14/95 | Prep. for Trial | 9 | 1,350 |
| 11/16/94 | Prep. for Trial | 9 | 1,350 |
| 11/17/94 | Prep. for Trial | 10 | 1,500 |
| 11/18/94 | Prep. for Trial | 8 | 1,200 |
| 11/21/94 | Prep. for Trial | 9 | 1,350 |
| 11/22/94 | Prep. for Trial | 10 | 1,500 |
| 11/23/94 | Prep. for Trial | 9 | 1,350 |
| 11/28/94 | Prep. for Trial | 10 | 1,500 |
| 11/29/94 | Prep. for Trial | 9 | 1,350 |
| 11/30/94 | Prep. for Trial | 10 | 1,500 |
| 12/1/94 | Prep. for Trial | 9 | 1,350 |
| 12/2/94 | Prep. for Trial | 8 | 1,200 |

---

[18] In its opening brief, petitioner cites Estate of John Webb, Deceased, 138 A.2d 435 (Pa. 1958), a 4-page opinion by the Supreme Court of Pennsylvania.

Attorney's fees in an estate case must be based on the reasonable value of the services actually rendered. Dorsett v. Hughes, 353 Pa. Super. 129, 509 A.2d 369 (1986). Attorneys seeking compensation from an estate have the burden of establishing facts that show the reasonableness of their fees and entitlement to the compensation claimed. In re Estate of Sonovick, 373 Pa. Super. 396, 400, 541 A.2d 374, 376 (1988).

The number of hours billed by Scott to the estate in this case is excessive and unreasonable. Under these circumstances we do not accept the self-serving, uncorroborated evidence of Tupitza, Scott, and Panepinto. In particular, we have no credible evidence in the record that details the work allegedly performed by Scott.

We are not unmindful of the peculiar circumstances in this case where $115,535 in legal fees billed to the estate by Scott would pass from the administratrix and sole beneficiary of the estate (Scott's wife) to the Tupitza law firm and return to Scott, to be reported on a joint Federal income return with Panepinto. We are left with the uneasy feeling that Scott and Panepinto, with the concurrence of Tupitza, engaged in a concerted effort to generate estate tax deductions to minimize the estate's Federal estate tax liability.

The proof as to the reasonableness of the legal fees billed by Scott is unsatisfactory from the standpoint of showing the nature, character and extent of the services rendered. To be

sure, based on the meager evidence in this record, his claimed legal fees are excessive and unreasonable.

Accordingly, we hold that petitioner has failed to prove that the estate is entitled to deduct as reasonable legal fees to the Tupitza law firm an amount in excess of the $100,000 conceded by respondent in her brief.[19]  The deduction is of course subject to proof of payment, as required by section 20.2053-3(c)(1), Estate Tax Regs.

To reflect the stipulations pertaining to the disposition of issues and our conclusion with respect to the deduction for legal fees to the Tupitza law firm,

Decision will be entered

under Rule 155.

---

[19]    If respondent had not conceded $100,000 as reasonable legal fees, the Court would have been inclined to allow a lesser amount in view of the facts and circumstances present in this case.